Frank J. MARGAN, Tammy M. Margan, John M. Margan, and Doreen M. Margan, Individually, and as the Natural Parents and Guardians of Their Infant Children, "A" Margan and "E" Margan; Jeffrey Margan, Paul M. Mahan, Anthony Pellegrino, Eileen Pellegrino, Clark S. Louer and Mary Ellen Louer, Individually, and as the Natural Parents, and Guardians of Their Infant Children, "S" Louer, and "T" Louer; Michael Goguen, and Nancy Goguen, Plaintiffs,

v.

William P. NILES; Garth Russell Johnston; Keith McKenna, Individually, and as an Agent and/or Employee and Police Officer of the Town of Glenville; and the Town of Glenville, New York; Defendants.

No. 00–CV–1201.

United States District Court, N.D. New York.

March 18, 2003.

Tobin and Dempf LLP (Kevin A. Luibrand, Esq., of counsel), Albany, NY, for Plaintiffs.

O'Connell & Aronowitz (Michael Louis Koenig, Esq., of counsel), Albany, NY, for Defendant William P. Niles.

Joseph F. Donnelly, Esq., Albany, NY, for Defendant Garth Russell Johnston.

Horigan, Horigan, Lombardo & Kelly, P.C. (Joseph D. Giannetti, Esq., of counsel), Amsterdam, NY, for Defendant Keith McKenna.

Petrone & Petrone, P.C. (David A. Bagley, Esq., Of Counsel), Utica, NY, for Defendant Town of Glenville.

## MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

The plaintiffs' amended complaint asserts five causes of action:

First—Violation of the Driver's Privacy Protection Act of 1994 ("DPPA"), 18 U.S.C. § 2721 *et. seq.;*

Second—Conspiracy to violate the DPPA;

Third—Intentional infliction of emotional distress (state law);

Fourth—Harassment (state law); and

Fifth—Violation of the right to privacy (state law).

Defendants Keith McKenna ("McKenna") and Town of Glenville ("Glenville") separately move for summary judgment pursuant to Fed.R.Civ.P. 56. Glenville moves to dismiss the amended complaint in its entirety. McKenna moves for partial summary judgment. Defendants William Niles ("Niles") and Garth Russell Johnston ("Johnston") have made no motion. Plaintiffs oppose with respect to the first and second causes of action. Oral argument was heard on November 22, 2002, in Albany, New York. Decision was reserved.

## II. *FACTS*

Defendant William Niles ("Niles") was an employee for the Hannaford Brothers ("Hannaford") grocery stores. (Pl.'s Ex. BB at 5.) Niles applied for and obtained workers' compensation benefits for an injury he allegedly suffered while on the job. (*Id.* at 8–9.) Hannaford assigned plaintiff Mary Ellen Louer ("Louer") to administer Niles' workers' compensation case. (Pl.'s Ex. X at 6.) Louer had reason to believe that Niles was not as disabled as he had claimed, and therefore retained the services of Compass Adjusters and Investigators ("Compass") to investigate Niles. (*Id.* at 46.) Compass then conducted surveillance of Niles. (Def. McKenna's Ex. O at 35–36.) Plaintiffs John M. Margan, Jeffrey Margan, Paul Mahan, and Anthony Pellegrino, (collectively the "Investigators") were Compass investigators who worked on the Niles case. (Def. McKen-

na's Exs. Q at 9; S at 10; T at 9–10; U at 10.)

Niles and his friend, defendant Garth Russell Johnston ("Johnston"), obtained the motor vehicle license plate numbers of the Investigators. Johnston then asked his friend, Glenville Police Officer McKenna, to run the license plate numbers and obtain information from the New York Statewide Police Information Network ("NYSPIN"), to which McKenna had access through the Glenville Police Department. (*See* Def. Glenville's Ex. F at 61, Def. Glenville's Ex. E at 42, 43, 48, Def. Glenville's Stmnt. of Mat. Facts at ¶¶ 6, 7, 18; Def. McKenna's Stmnt. of Mat. Facts at ¶¶ 15–24, 29.) Johnston also asked McKenna to run a "name search" on Louer. (Def. McKenna's Stmnt. of Mat. Facts at ¶ 29.) McKenna ran the license plate numbers of the Investigators. (*Id.* at ¶ 17.) By running the license plates, he obtained information regarding the names of the owners of the vehicles and their addresses. (*Id.* at ¶¶ 18–22; Def. Glenville's Stmnt. of Mat. Facts at ¶¶ 7–11.) He then provided this information to Johnston, who, in turn, provided the information to Niles. (Def. McKenna's Stmnt of Mat. Facts at ¶¶ 23–24; Def. Glenville's Stmnt. of Mat. Facts at ¶¶ 12–13.) McKenna was unable to locate information on Louer. (*Id.* at ¶ 18; Pl.'s Stmnt. of Mat. Facts at ¶ 18.)

Niles and/or Johnston went to Louer's home; videotaped her family, including her children; delivered the videotape together with a threatening note to her home; sent her flowers with a threatening greeting card attached; and otherwise harassed or threatened her. (Def. Glenville's Stmnt. of Mat. Facts at ¶ 20; Pl.'s Ex. H at 16–20.) Niles and/or Johnston also engaged in acts of vandalism at the home of plaintiff John M. Margan. (Pl.'s Ex. H at 16–20.) Niles and/or Johnston also en-

gaged in harassing and/or threatening conduct towards plaintiff Anthony Pellegrino (Def. Glenville's Ex. F at 64–65.) This conduct led to criminal charges against Niles and Johnston. (*See generally* Pl.'s Ex. H.) Both Niles and Johnston pleaded guilty to a count of conspiracy to commit extortion. (*See* Pl.'s Ex. H.) The underlying criminal acts are part of the same acts at issue in this matter. This action followed.

### III. STANDARD OF REVIEW

■ A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from that evidence in favor of the nonmoving party, and the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining a motion for summary judgment, all inferences to be drawn from the facts contained in the exhibits and depositions "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hawkins v. Steingut,* 829 F.2d 317, 319 (2d Cir.1987). Nevertheless, "the litigant opposing summary judgment 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)).[1]

### IV. DISCUSSION

#### A. Driver's Privacy Protection Act (First Cause of Action )

##### 1. Parties Protected

■ Defendants first argue that 18 U.S.C. § 2724 only applies to Doreen M. Margan, Jeffrey Margan, Paul Mahan, and Anthony Pellegrino, and not their spouses or children, because these are the only plaintiffs whose personal information may have been improperly obtained from motor vehicle records. Plaintiffs counter that the wording of the statute is broad enough to include all persons whose information may

---

1. Before continuing, it should be noted that plaintiffs' responsive statement of material facts fails to comply with the requirements of N.D.N.Y.L.R. 7.1(a)(3).

Perhaps the most abused Rule is 7.1(a)(3) ..., which requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where the facts are established. A similar obligation is placed upon the non-movant who 'shall file a response to the Statement of Material Facts ... [setting] forth a specific citation to the record where the factual issue arises.' N.D.N.Y.L.R. 7.1(a)(3). This is not a complex procedural requirement with which to comply, but a simple, straightforward requirement designed to

force litigants to focus sharply on the specific factual issues in dispute, and to enable the Court to move immediately to the gravamen of the case.

*Osier v. Broome County,* 47 F.Supp.2d 311 317 (N.D.N.Y.1999) (internal quotations and citations omitted).

Plaintiffs' Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiffs' responsive Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered. *See* N.D.N.Y.L.R. 7.1(b)(3) ("Any papers required under this Rule that are ... not in compliance with this Rule shall not be considered unless good cause is shown.").

have been disclosed as a result of an improper use of motor vehicle records.

Information in a motor vehicle record may pertain to more than just the motor vehicle operator. For example, the title to a motor vehicle that is jointly owned by two or more people (*e.g.* a husband and wife or three friends) will contain information (such as names) pertaining to all those people. Similarly, the registration of a motor vehicle registered to one spouse ordinarily will contain information (such as address and telephone number) regarding the other spouse.[2] *See* 18 U.S.C. § 2725(3) (defining address and telephone number as personal information protected under the DPPA). This latter scenario is the subject of the instant debate. The specific question is whether the spouse and/or children of an individual whose address has been obtained from a motor vehicle record may maintain an action under the DPPA where the spouse and children share the same address as that individual.

A brief history of the DPPA is helpful in understanding its purpose and the ensuing discussion. The DPPA was part of crime fighting legislation enacted in response to the murder of a young woman in Los Angeles, California in 1989. *See* 139 Cong. Rec. S15745–01, S15761–66 (1993); 145 Cong. Rec. S14533–02, S14538 (1999). Rebecca Schaeffer was an actress who starred on a television show *My Sister Sam* in the late 1980s. *See* 139 Cong. Rec. S15745–01, S15765. One of Schaeffer's "fans," Robert Bardo, retained a private

investigator who recorded Schaeffer's license plate number. The investigator then went to the California State Department of Motor Vehicles where, for a nominal fee, he was able to obtain Ms. Schaeffer's home address.[3] *See id.* With the knowledge of Schaeffer's home address, Bardo went to her home and murdered her. *See id.*

Following this incident, several members of Congress sought to prevent state motor vehicle departments from freely providing personal information obtained from motor vehicle records. *See* 145 Cong. Rec. S14533–02, S14538. In 1994, Congress enacted the Violent Crime Control and Law Enforcement Act of 1994, of which the DPPA was a part. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, Tit. XXX, 108 Stat.2099–2102, 18 U.S.C. § 2721 *et. seq.*[4] Through the DPPA, Congress intended to prevent stalkers, harassers, would-be criminals, and other unauthorized individuals from obtaining and using personal information from motor vehicle records. *See* 145 Cong. Rec. S14533–02, S14538 ("[T]he murder of Rebecca Schaeffer led to the [DPPA]."); 141 Cong. Rec. H416–06, H447 (1995) (statement of Rep. Dingell) ("Last year, as part of the crime bill, Congress heard the concerns of women who were being stalked because of easy access to motor vehicle records that reveal . . . addresses. To address this problem, Congress enacted the [DPPA]."); 140 Cong.

---

2. This is because both spouses frequently have the same address and telephone number.

3. Many state departments of motor vehicles made personal information freely available upon payment of a fee. *See* 139 Cong. Rec. S15745–01, S15762.

4. In its reply memorandum of law, Glenville posits that "the main impetus for the [DPPA] was to address a perceived problem from

sales of motor vehicle record information for commercial purposes." (Def. Glenville's Reply Mem. of Law at 4.) While the commercial use of personal information from motor vehicle records was a concern, *see Reno v. Condon*, 528 U.S. 141, 149, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000), as the instant discussion makes clear, the DPPA was a crime fighting measure; not a general privacy protection measure.

Rec. H2518,01, H2527 (1994) (statement of Rep. Goss) ("[T]he intent of this bill is simple and straightforward: We want to stop stalkers from obtaining the name and address of their prey before another tragedy occurs... [T]he [DPPA] ... is a reasonable and practical crime fighting measure."); 139 Cong. Rec. S15745–01, S15764–66 (1993) (statements of Sens. Robb, Biden and Harkin) (stating that "[t]his amendment closes a loophole in the law that permits stalkers to obtain—on demand—private, personal information about their potential victims" and discussing situations where: (1) anti-abortion activists obtained the name and address of an obstetrical patient from department of transportation records and sent her threatening letters; (2) an obsessive fan obtained the address of a fashion model from the department of motor vehicles, and then went to her home and assaulted her; and (3) a gang of teens located cars with expensive stereos, recorded the license numbers and found the owner's home address through motor vehicle records.) To further its intended goal, the DPPA provides for criminal penalties, 18 U.S.C. § 2723(a), and a private cause of action, 18 U.S.C. § 2724(a).

Section 2724(a) of the DPPA provides that:

> A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

18 U.S.C. § 2724(a). Section 2725(1) defines the phrase "motor vehicle record" to mean "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." The term "person" is defined to include "an individual, organization or entity." 18 U.S.C. § 2725(2). Finally, the phrase "personal information" is defined to mean:

> information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5–digit zip cope), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations and driver's status.

18 U.S.C. § 2725(3).

■ Which plaintiffs fall within the protection of the DPPA under the facts and circumstances of this case may be resolved by an analysis of the plain, unambiguous language of the statute. *See In re The Caldor Corp.*, 303 F.3d 161, 167–68 (2d Cir.2002). By replacing the phrases "personal information" and "motor vehicle record" with their statutory definitions, section 2724 reads as follows:

> A person who knowingly obtains, discloses or uses [information that identifies an individual, including an individual's ... address],[5] from [any record that pertains to a motor vehicle operator's ... motor vehicle title, motor vehicle registration, or identification card],[6] for a purpose not permitted under this

---

**5.** The phrase "information that identifies an individual, including an individual's ... address" comes from the statutory definition of "personal information" found at 18 U.S.C. § 2725(3) and is substituted in place of the phrase "personal information."

**6.** The phrase "any record that pertain to a motor vehicle operator's ... motor vehicle title, motor vehicle registration, or identification card" comes from the statutory definition of "motor vehicle record" found at 18 U.S.C. § 2725(1) and is substituted in place of the phrase "motor vehicle record."

chapter shall be liable to the individual to whom the information pertains.

Further refining the statute, it can be read as follows: "A person who knowingly obtains, discloses or uses [information that identifies ... an individual's ... address],[7] from a motor vehicle record ... shall be liable to the individual to whom the information pertains." It, thus, is apparent from this language that a person who unlawfully obtains an individual's address from a motor vehicle record is liable to that individual. Accordingly, any individual whose address was obtained from a motor vehicle record is a proper plaintiff.

This conclusion is supported by further analysis of the language of the statute. The DPPA distinguishes between two types, or groups, of people: (1) "motor vehicle operators"; and (2) "persons" and "individuals." *Compare* 18 U.S.C. § 2725(1) (" 'motor vehicle record' means any record that pertain to a *motor vehicle operator's* permit.") (emphasis supplied), *with* 18 U.S.C. § 2725(2) (" 'person' means an individual.") When Congress wished to refer solely to the operator of the motor vehicle, it knew how to do so. It, therefore, follows that if Congress intended to limit the private cause of action under section 2724(a) to motor vehicle operators or some other discrete group, it would have expressly done so. Section 2724(a), however, states that "the individual to whom the information pertains ... may bring a civil action," thereby suggesting a class of persons broader than "motor vehicle operators."

Similarly, the statute prohibits the disclosure of "information that identifies *an individual*" obtained from "a motor vehicle operator's permit," title, registration, or identification card. 18 U.S.C. §§ 2724, 27225(1),(3). The word "an" is "the form of a before an initial vowel sound." *See* Random House Dict. of the English Lang. at 52 (1979) (emphasis in original). The word "a" is an indefinite article and means "not any particular or certain one of a class or group." *Id.* at 1. By using an indefinite article, the statutory language is broad enough to include personal information pertaining to individuals other than a motor vehicle operator, licensee, registrant or owner.[8] The statute, therefore, includes anyone within that class of people whose personal information (including addresses) was obtained from a motor vehicle operator's permit, registration, title, or identification card "for a purpose not permitted [by the DPPA]."[9] 18 U.S.C. § 2724.

7. This alteration of the statute replaces the phrase "personal information" with the relevant language from the statutory definition of that phrase.

8. If Congress wished to limit the scope of the statute, it could have used a definite article, such as "the" or a more specific word, such as "that." *Id.* at 1469, 1470. For example, Congress could have prohibited the disclosure of information that identifies an individual obtained from *the (or that) individual's* motor vehicle operator's permit, title, registration or identification card. Alternatively, Congress could have prohibited the disclosure of personal information from a motor vehicle record pertaining to *the (or that)* individual. These alternative approaches would have the effect of limiting the private cause of action to the individual whose motor vehicle record was actually obtained. However, Congress did not adopt such an approach.

9. In describing the structure of the DPPA, the Supreme Court stated that "any person who knowingly obtains, discloses, or uses information from a state motor vehicle record ... may be subject to liability in a civil action *brought by the driver to whom the information pertains.*" *Reno v. Condon*, 528 U.S. 141, 146–47, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) (emphasis added). This statement was unnecessary to the resolution of the matter before the Supreme Court (the constitutionality of the DPPA) and was merely a brief overview of the structure of the DPPA. The Su-

In the present matter, McKenna's search of motor vehicle records disclosed the following:

&mdash; the name and address of plaintiff Paul Mahan (Def. McKenna's Stmnt. of Mat. Facts at ¶ 19);

&mdash; the name of plaintiff Jeffrey Margan (*Id.* at ¶ 20);

&mdash; the name and post office address of Doreen Margan (*Id.* at ¶ 21); and

&mdash; the name and address of plaintiffs Eileen and Anthony Pellegrino (*Id.* at ¶ 22);

Thus, these plaintiffs may maintain an action under the DPPA.[10]

There is a triable issue of fact whether plaintiffs John Margan, "A" Margan, and "E" Margan are proper plaintiffs. The evidence in the record suggests that McKenna ran Doreen Margan's license plate numbers and obtained a post office box address. (Def. McKenna's Stmnt. of Mat. Facts at ¶ 21; Def. McKenna's Ex. FF.) The record does not reveal whether this post office box is registered solely in the name of Doreen Margan, or whether it also is registered in the name of John Margan or the entire family. If the post office box is registered to John Margan,

his personal information was obtained and he is a proper DPPA plaintiff. Similarly, if the post office box is registered to the Margan family, then their personal information was obtained from a motor vehicle record and they are all proper DPPA plaintiffs. The evidence in the record further suggests that the street address of John, Doreen, "A" and "E" Margan was obtained through a modified NYSPIN search, possibly by using Doreen Margan's driver's license. (Def. McKenna's Stmnt. of Mat. Facts at ¶ 21; Def. Glenville's Stmnt. of Mat. Facts at ¶ 8; Pl.'s Stmnt. of Mat. Facts at ¶ 8.) If the Margan's street address was, in fact, obtained from a motor vehicle record, then John, "A" and "E" Margan are proper plaintiffs.[11]

There is no evidence, however, from which a fair-minded trier of fact could reasonably conclude that the personal information of plaintiffs Clark Louer, Mary Ellen Louer, "S" Louer, and "T" Louer was obtained from a motor vehicle record. Although it is undisputed that McKenna ran a NYSPIN "name search" on Mary Ellen Louer using the names "Emmie Louer" and "E Louer," the search did not

---

preme Court did not have reason to discuss the class of persons who may bring suit under the DPPA. Accordingly, this statement is, at most, *dicta.*

10. Defendants do not dispute that Paul Mahan, Jeffrey Margan, Doreen Margan and Anthony Pellegrino may maintain an action under the DPPA. (*See* Def. Glenville's Mem. of Law at 8; Def. McKenna's Mem. of Law at 2.) Eileen Pellegrino is a proper plaintiff because her address was disclosed from a search on Anthony Pellegrino's license plates. (*See* Def. McKenna's Stmnt. of Mat. Facts at ¶ 5.)

11. This is because John, Doreen, "A" and "E" Margan all reside at the same address. (*See* Def. McKenna's Stmnt. of Mat. Facts at ¶ 2.). Permitting John, "A" and "E" Margan to maintain an action under the DPPA would

further Congress's intent. Niles undoubtedly wished to obtain personal information about John Margan, one of the individuals that was investigating his workers' compensation claim. Niles sought to obtain such information by recording the license plate number of a vehicle driven by John Margan and, through Johnston, having McKenna run the license plate number. The vehicle, however, was not owned by John Margan, but by his wife, Doreen Margan. (*See* Def. McKenna's Stmnt. of Mat. Facts at ¶ 9; Def. Glenville's Stmnt. of Mat. Facts at ¶ 8.) Niles used the information regarding Doreen Margan to learn John Margan's address (which also is the address of his minor children) and engage in criminal conduct. As previously discussed, the DPPA was specifically designed to prevent persons such as Niles and Johnston from using motor vehicle records as a means of perpetrating their criminal and/or harassing behavior.

reveal any personal information. (Def. McKenna's Stmnt. of Mat. Facts at ¶ 29; Pl.'s Resp. to Def. McKenna's Stmnt. of Mat. Facts at ¶ 29.) The same applies to plaintiffs Frank Margan, Tammy Margan, Michael Goguen, and Nancy Goguen. Further, there is no evidence in the record from which a fair-minded trier of fact could reasonably conclude that McKenna obtained personal information concerning Frank Margan, Tammy Margan, Nancy Goguen, or Michael Goguen from a motor vehicle record. Accordingly, Frank Margan, Tammy Margan, Mary Ellen Louer, Clark Louer, "S" Louer, "T" Louer, Nancy Goguen, and Michael Goguen may not maintain actions under the DPPA.

### 2. *Town of Glenville*

▪ The Town of Glenville argues that akin to actions pursuant to 42 U.S.C. § 1983, there is no vicarious liability under 18 U.S.C. § 2724, and a municipality may be found liable only upon proof of a municipal custom or policy. Glenville contends that the DPPA's imposition of civil penalties on states only upon a showing of a "policy or practice of substantial noncompliance," 18 U.S.C. § 2723(b), "provides another indication that governmental entities are to be held responsible where there are institutional deficiencies present giving rise to violations." (Def. Glenville's Mem. of Law at 11.) Plaintiffs respond that the Town's argument is meritless and there are numerous situations in which vicarious liability is imposed for violations of federal statutes.

▪ The DPPA makes no reference to the issue of vicarious liability. "[U]nder general rules of agency law, principals are liable when their agents act with apparent authority and commit torts." *Am. Soc. of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 565, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). "The apparent authority theory has

long been the settled rule in the federal system." *Id.* at 567, 102 S.Ct. 1935. " '[F]ew doctrines of law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own.' " *Id.* at 568, 102 S.Ct. 1935 (quoting *Gleason v. Seaboard Air Line R. Co.*, 278 U.S. 349, 356, 49 S.Ct. 161, 73 L.Ed. 415 (1929)). The Supreme Court has noted that:

> In a wide variety of areas, the federal courts, like this Court in *Gleason,* have imposed liability upon principals for the misdeeds of agents acting with apparent authority. *See, e.g., Dark v. United States,* 641 F.2d 805 (9th Cir.1981) (federal tax liability); *Nat'l Acceptance Co. v. Coal Producers Ass'n,* 604 F.2d 540 (7th Cir.1979) (common-law tax fraud); *Holloway v. Howerdd,* 536 F.2d 690 (6th Cir.1976) (federal securities fraud); *United States v. Sanchez,* 521 F.2d 244 (5th Cir.1975) (bail bond fraud), *cert. denied,* 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 77 (1976); *Kerbs v. Fall River Indus. Inc.,* 502 F.2d 731 (10th Cir. 1974); *Gilmore v. Constitution Life Ins. Co.,* 502 F.2d 1344 (10th Cir.1974) (common law fraud).

*Hydrolevel,* 456 U.S. at 568, 102 S.Ct. 1935.

Based on the foregoing principles, in *Hydrolevel,* a case involving the antitrust laws, the Supreme Court stated that:

> '[T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat' to deter antitrust violations. [*Perma Life Mufflers, Inc. v. Int'l Parts Corp.,* 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).] ... In this case, we can honor the statutory purpose best by interpreting the antitrust private cause of action to be at least as broad as a plaintiff's right to sue for analogous torts,

absent indication that the antitrust laws are not intended to reach so far.... A principal purpose of the antitrust private cause of action ... is, of course, to deter anticompetitive practices.... It is true that imposing liability on ... agents themselves will have some deterrent effect, because they will know that if they violate the antitrust laws ... they risk the consequences of personal civil liability. But if, in addition, [the principal] is civilly liable for the antitrust violations of .its agents acting with apparent authority, it is much more likely that similar antitrust violations will not occur in the future. '[P]ressure [will be] brought [on the organization] to see to it that [its] agents abide by the law.' *United States v. A & P Trucking Co.*, 358 U.S. 121, 126, 79 S.Ct. 203, 3 L.Ed.2d 165 (1958).

456 U.S. at 569–573, 102 S.Ct. 1935. Similarly, in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court held that an employer, as principal, can be held vicariously liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, for discrimination caused by the principal's supervisory agents. Significantly, the *Faragher* Court did not carve out any special exception for municipal employers.

More recently, in *Meyer v. Holley*, 537 U.S. 280, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003), the Supreme Court held that the Fair Housing Act, 42 U.S.C. §§ 3604(b), 3605(a), imposed vicarious liability in accordance with traditional agency principles.

> This Court has noted that an action brought for compensation by a victim of housing discrimination is, in effect, a tort action.... And the Court has assumed that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vi-

carious liability rules and consequently intends its legislation to incorporate those rules.... It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment.... And Congress' silence, while permitting an inference that Congress intended to apply *ordinary* background tort principles, cannot show that it intended to apply an unusual modification of those rules. Where Congress ... has not expressed a contrary intent, the Court has drawn the inference that it intended ordinary rules to apply.

*Meyer*, 537 U.S. at ——, 123 S.Ct. at 829.

In addition to the above-cited cases, the courts of appeal have imposed vicarious liability for violations of other federal statutes. *See, e.g., Quick v. Peoples Bank of Cullman County*, 993 F.2d 793 (11th Cir. 1993) (RICO); *United States v. O'Connell*, 890 F.2d 563 (1st Cir.1989) (False Claims Act). In *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir.1998), the Sixth Circuit held that vicarious liability may be imposed for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1861, *et. seq.* *Jones* is instructive because much like the DPPA, the FCRA is designed to protect individuals' personal information. *See Jones*, 144 F.3d 961, 965 ("Protecting consumers from the improper use of credit reports is an underlying policy of the FCRA."). In addressing whether the FCRA imposes vicarious liability, the Sixth Circuit stated as follows:

> In the absence of specific language regarding the imposition of vicarious liability based on apparent authority, we must consider whether an apparent authority theory is consistent with Congress's intent behind the FCRA. Protecting consumers from the improper

use of credit reports is an underlying policy of the FCRA. An apparent authority theory is in keeping with the FCRA's underlying deterrent purpose because employers are in a better position to protect consumers by use of internal safeguards. *See Yohay v. City of Alexandria Employees Credit Union, Inc.,* 827 F.2d 967, 972 (4th Cir.1987) (affirming an employer's liability under the FCRA for employee's wrongful actions where employee-agent acted with apparent authority in improperly obtaining a credit report); *see also [Hydrolevel]*, 456 U.S. at 572–73, 102 S.Ct. 1935 (finding an apparent authority rule consistent with the statutory goal of deterring antitrust violations); *[In re] Atlantic Fin. Mgmt.[, Inc.]*, 784 F.2d [29,] 32 [ (1st Cir.1996) ] (noting in the context of interpreting a securities statute that "imposing [apparent authority] ... liability will encourage corporate officials to prevent unauthorized (but 'apparently authorized') misrepresentations, thereby helping to achieve an important ... purpose [of the statute]"); *Petro–Tech, Inc. v. Western Co. of No. Am.,* 824 F.2d 1349, 1356 (3d Cir.1987) (noting applicability of common law doctrines in application of federal statutes when common law principles advance the goals of the particular federal statute). Because application of the apparent authority doctrine advances the FCRA's goals and produces no inconsistencies with other FCRA provisions, we conclude that such a theory of liability is an appropriately

operative theory of liability under the statute.

*Jones,* 144 F.3d at 965–66.

■ The same principles apply to the instant situation. The DPPA can be likened to a privacy-based tort action and the FCRA. This is because like privacy-based torts and the FCRA, the DPPA protects the unauthorized use and disclosure of personal information. *See Hydrolevel,* 456 U.S. at 565–66, 102 S.Ct. 1935 (likening antitrust violations to torts); *Jones,* 144 F.3d at 965–66. "When Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer,* 537 U.S. at ——, 123 S.Ct. at 828. Moreover, like in the case of the antitrust laws, the FCRA, and other similar statutes, imposing vicarious liability upon principals will further the underlying purposes of the DPPA. Imposing individual liability on agents will undoubtedly have some deterrent effect. "But, if in addition, [the principal] is civilly liable for the [violations of the DPPA by] its agents acting with apparent authority, it is much more likely that similar [DPPA] violations will not occur in the future." *Hydrolevel,* 456 U.S. at 572, 102 S.Ct. 1935. This is particularly so in the present situation where law enforcement personnel are in a somewhat unique situation wherein they have relatively easy, free, and unfettered access to motor vehicle records, which access can lead to unchecked abuse.[12] By imposing vicarious

**12.** McKenna testified at deposition that he runs license plate numbers for private citizens approximately six to ten times per year. (Def. McKenna's Ex. AA at 83.) McKenna also suggested that other employees of the Glenville Police Department have run names or plates through the NYSPIN and given the information to private citizens. (*Id.* at 84–86.) Congress was cognizant of the potential of abuse of motor vehicle records by law

enforcement officers. *See* 139 Cong. Rec. S15958–04, S15962 (1993) (Statement of Sen. Harkin) ("A false representation that this information will be used for law enforcement purposes would be punishable .... Similarly, a law enforcement officer who knowingly provided personal information to a person or group who intended to use that information for purposes that were not in furtherance of

liability upon employers, they will have incentive to adopt appropriate policies and procedures to prevent the misuse of motor vehicle records, thereby furthering the DPPA's goals of protecting individuals' personal information found in motor vehicle records. *See Jones*, 144 F.3d 961. Because there is nothing in the DPPA suggesting that it was not intended to impose vicarious liability and "application of the apparent authority doctrine advances the [DPPA's] goals and produces no inconsistencies with other [DPPA] provisions, ... a theory of [vicarious] liability is an appropriately operative theory of liability under the statute." *Jones*, 144 F.3d at 966; *Hydrolevel*, 456 U.S. at 569, 102 S.Ct. 1935.[13]

■ Glenville's argument that a different rule should apply to municipalities is unavailing. First, as a general rule, municipalities, like most principals, may be held vicariously liable for the torts of their agents. *See, e.g., Faragiano v. Town of Concord*, 96 N.Y.2d 776, 725 N.Y.S.2d 609, 749 N.E.2d 184 (2001). As discussed, in *Faragher* the Supreme Court did not find reason to make special rules for the imposition of vicarious liability on municipalities under Title VII. Likewise, there is no reason to fashion such a special rule here.

Second, pursuant to 18 U.S.C. § 2724(a), states and state agencies are expressly exempted from civil liability under the DPPA.[14] Municipalities are not. 18 U.S.C. §§ 2724(a), 2725(2). A state department of motor vehicles may, however, be subject to a civil penalty imposed by the Attorney General if it has "a policy or practice of substantial noncompliance with this chapter." 18 U.S.C. § 2723(b). This differential treatment of states and state departments of motor vehicles provides no basis upon which to conclude that Congress intended to treat municipalities different than other "persons."

Third, a different rule applies with respect to actions brought pursuant to 42 U.S.C. § 1983 because a municipality is liable under § 1983 "only ... when it can be fairly said that the [municipality] itself is the wrongdoer." *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). "It is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983." *Id.* (internal citations, quotations and alterations omitted). "It [is] necessary to analyze whether execution of a municipal policy inflicted the injury in ... cases [brought pursuant to 42 U.S.C. § 1983] because, *unlike ordinary tort litigation*, the doctrine of respondeat superior [is] inapplicable." *Id.* (emphasis added). As noted, the DPPA is more akin to an ordinary tort than an action pursuant to section 1983 (which requires conduct under "color of state law"), and therefore, analogy to section 1983 principles of liability is inappropriate.[15]

---

the function of that officer's agency would be in violation of the [DPPA].")

13. Arguably, there would be an inconsistency in imposing vicarious liability upon states and state agencies because they are exempted from civil liability under 18 U.S.C. § 2724. That issue, however, need not be addressed in this case. There are no inconsistencies with imposing vicarious liability upon municipalities.

14. Section 2724(a) imposes liability upon a "person" who improperly obtains, discloses or uses personal information from a motor vehicle record. States and state agencies are excluded from the statutory definition of "person." 18 U.S.C. § 2725(2).

15. Had Congress wished a different result with respect to municipalities, it could have retained section 1983 as the mechanism for suing municipalities for violations of the DPPA. Congress carefully defined the term "person" and, in so doing, excluded states

**B. Conspiracy to Violate the DPPA—(Second Cause of Action )**

 Defendants McKenna and Glenville next move to dismiss plaintiffs' conspiracy claim. "[T]here is no federal cause of action for conspiracy under common law." *See LaFountain v. Kerckaert,* 95 F.3d 1152, 1996 WL 479131, at *2 (6th Cir.1996) (table decision); *see also In re Managed Care Litig.,* 185 F.Supp.2d 1310, 1335 (S.D.Fl.2002). Similarly there is no separate cause of action for conspiracy under New York law. *AHEPA 91, Inc. v. United States Dep't of Housing and Urban Dev.,* 43 Fed.Appx. 450, 456 n. 6. (2d Cir.2002); *Alexander & Alexander of New York, Inc. v. Fritzen,* 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986). "Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." *Id.*

 Because there is no independent cause of action for conspiracy, plaintiffs' Second Cause of Action must be dismissed as to all defendants.[16] *See Hi Pockets, Inc. v. The Music Conservatory of Westchester, Inc.,* 192 F.Supp.2d 143, 157 (S.D.N.Y.2002). This does not mean that plaintiffs may not offer proof of a conspiracy to violate the DPPA. Evidence of a conspiracy may be used to connect the actions of the various defendants with a violation of the DPPA. In the instant case, the extent to which McKenna knew of, and participated in, Niles and Johnston's conduct or scheme is relevant to the issue of whether McKenna knowingly obtained, disclosed, or used personal information from a motor vehicle record "for a purpose not permitted" by the DPPA. 18 U.S.C. § 2724(a); *see* 18 U.S.C. § 2721(b) (setting forth the permissible uses); *Fritzen,* 68 N.Y.2d at 969, 510 N.Y.S.2d 546, 503 N.E.2d 102.

**C. Intentional Infliction of Emotional Distress—(Third Cause of Action )**

 Defendants McKenna and Glenville also move to dismiss plaintiffs' claim for the intentional infliction of emotional distress. Plaintiffs have not opposed defendants' motion in this regard.

 Under New York law, a claim for intentional infliction of emotional distress requires a showing of: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Conboy v. AT & T Corp.,* 241 F.3d 242, 258 (2d Cir.2001); *Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir. 1999). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983).

There is no evidence in the record from which a fair-minded trier of fact could reasonably conclude that the conduct of these defendants (running license plate numbers and/or name searches) constitutes extreme and outrageous conduct. *See, e.g., Rall v. Hellman,* 284 A.D.2d 113, 115, 726 N.Y.S.2d 629 (1st Dep't 2001); *Andrews v. Bruk,* 220 A.D.2d 376, 377, 631

---

and state agencies. 18 U.S.C. § 2725(2). Congress's decision not to exclude municipalities evinces its intention to put municipalities on the same footing as all other "persons."

**16.** Even though Niles and Johnston have not made motions, no purpose would be served by keeping them as defendants in this cause of action.

N.Y.S.2d 771 (2d Dep't 1995). Accordingly, the intentional infliction of emotional distress claim must be dismissed against McKenna and Glenville.

### D. Harassment—(Fourth Cause of Action )

■ Plaintiffs' cause of action for harassment must be dismissed against all defendants [17] because New York does not recognize such a civil cause of action.[18] *Broadway Central Property Inc. v. 682 Tenant Corp.*, 298 A.D.2d 253, 254, 749 N.Y.S.2d 225 (1st Dept 2002); *Goldstein v. Tabb*, 177 A.D.2d 470, 575 N.Y.S.2d 902 (2d Dep't 1991), *leave to appeal denied,* 80 N.Y.2d 753, 587 N.Y.S.2d 905, 600 N.E.2d 632 (1992).

### E. Right to Privacy—(Fifth Cause of Action )

■ Plaintiffs' cause of action for a violation of their right to privacy must be dismissed against all defendants [19] because New York only recognizes a limited statutory right of privacy, and there is no allegation in the Complaint or evidence in the record tending to suggest that any defendant used a plaintiff's name, portrait, or picture for advertising or trade purposes. *See* N.Y. Civ. Rights Law §§ 50, 51; *Messenger v. Gruner & Jahr Printing and Publishing,* 94 N.Y.2d 436, 706 N.Y.S.2d 52, 727 N.E.2d 549 (2000).[20]

## V. CONCLUSION

Any individual whose address is obtained, used, or disclosed from a motor vehicle record for a purpose not permitted by the DPPA, may bring a civil action pursuant to 18 U.S.C. § 2724(a). The DPPA imposes vicarious liability upon municipalities for the actions of their agents who act with apparent authority. There is no independent cause of action for conspiracy to violate DPPA. Plaintiffs failed to demonstrate that McKenna or Glenville engaged in extreme or outrageous conduct sufficient to support a claim for the intentional infliction of emotional distress. New York does not recognize a civil cause of action for harassment. Plaintiffs failed to allege or set forth facts to substantiate a privacy claim within the purview of N.Y. Civ. Rights Law §§ 50 and 51.

As a result of this decision, the plaintiffs John M. Margan, Doreen M. Margan, "A" Margan, "E" Margan, Jeffrey Margan, Paul M. Mahan, Anthony Pellegrino, and Eileen Pellegrino may continue to maintain their First Cause of Action under the DPPA against Niles, Johnston, McKenna, and Glenville. All plaintiffs may continue to maintain their Third Cause of Action for intentional infliction of emotional distress against Niles and Johnston.

Accordingly, it is

ORDERED that

1. The *First Cause of Action* is DISMISSED as to plaintiffs Frank Margan, Tammy Margan, Clark S. Louer, Mary Ellen Louer, "S" Louer, "T" Louer, Michael Goguen, and Nancy Goguen;

2. The *Second Cause of Action* is DISMISSED in its entirety as to all defendants;

3. The *Third Cause of Action* is DISMISSED as to defendants McKenna and Glenville;

---

**17.** See footnote 16.

**18.** Plaintiffs did not oppose defendants' motion to dismiss the harassment claim.

**19.** See footnote 16.

**20.** Plaintiffs did not oppose defendants' motion to dismiss the privacy claim.

4. The *Fourth Cause of Action* is DISMISSED in its entirety as to all defendants;

5. The *Fifth Cause of Action* is DISMISSED in its entirety as to all defendants.

IT IS SO ORDERED.