William A. **PARUS**, Plaintiff,

and

**GERMANTOWN MUTUAL INSURANCE COMPANY**, Intervening Plaintiff,

v.

Thomas **KROEPLIN**, Dawn Bresnahan, individually and in her official capacity as an employee of the Town of Minocqua Police Department, Town of Minocqua, Wisconsin, Clay Kreitlow, individually and in his capacity as an employee of the Town of Woodruff Police Department, and Town of Woodruff, Wisconsin, Defendants.

No. 05–C–0063–C.

United States District Court, W.D. Wisconsin.

Dec. 6, 2005.

Richard M. Burnham, Neider & Boucher, S.C., Madison, WI, for Plaintiff.

Michael J. Roman, Zalewski, Klinner & Kramer, LLP, Wausau, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for monetary relief, plaintiff William Parus contends that defendant Dawn Bresnahan, an employee of the Town of Minocqua, violated the Driver's Privacy Protection Act of 1994, 18 U.S.C. § 2721, by illegally disclosing plaintiff's personal information from the Wisconsin Department of Motor Vehicles database to defendant Thomas Kroeplin, a conservation warden employed by the Wisconsin Department of Natural Resources. Jurisdiction is present under 28 U.S.C. § 1331.

This case is before the court on a motion for summary judgment filed by defendants Bresnahan and Town of Minocqua. (Intervening plaintiff Germantown Mutual Insurance Co. has not filed a response to defendants' motion. Because Germantown Mutual Insurance Co. plays no role in this motion, all references to "plaintiff" will be to William Parus.) The undisputed facts reveal that when defendant Bresnahan disclosed plaintiff's motor vehicle record information to defendant Kroeplin, she was carrying out a law enforcement function within the meaning of 18 U.S.C. § 2721(b)(1). Therefore, the motion for summary judgment will be granted.

From the parties' proposed findings of fact, I find the following to be material and undisputed.

## UNDISPUTED FACTS

### A. *The Cast*

Plaintiff William Parus is an adult resident of Wisconsin. At all times relevant to this lawsuit, he resided in the Town of Minocqua, Wisconsin. Defendant Town of Minocqua is a Wisconsin municipality, with a population of approximately 5,000.

Defendant Dawn Bresnahan is an adult resident of the Town of Minocqua and has been employed by the town as a police dispatcher for eleven years. As a dispatcher, defendant Bresnahan is not considered a law enforcement officer with arrest powers or investigative authority.

Andrew Cator is an adult resident of the Town of Minocqua. His aunt, Sherry Kroeplin, is married to defendant Thomas Kroeplin.

Julie Erickson is an adult resident of the Town of Minocqua. From May 2002 until August 2004, Erickson was romantically involved with Cator. During that time, they had a son together. In early September 2004, Erickson began dating plaintiff.

Freya Van Skyhawk is a friend of Andrew Cator.

### B. *The Setting*

The Minocqua Police Department has adopted policies and procedures governing police dispatchers. Department Policy and Procedure 5.9.1 describes the basic functions of a police dispatcher:

> The police dispatcher is the link between the public's call for service and the timely, efficient delivery of service. The dispatcher determines the nature of the request for service, conveys the information to the appropriate response personnel and coordinates the delivery of service as call [sic] for by department supervisors and policy.

The primary function of a dispatcher is to obtain requested information quickly and relay it to officers in the field or to relay information between other law enforcement agencies, so they can perform their law enforcement functions. Because dispatchers do not have the training necessary to conduct police investigations or perform other law enforcement duties, department policy provides that police dispatchers should not second-guess or question the actions or motives of an officer in the field unless there is absolutely clear evidence that the officer is violating departmental policy.

The Minocqua Police Department maintains a secure computer terminal from which dispatchers can access the state of Wisconsin's Transaction Information for the Management of Enforcement (TIME) database, which contains data from various secondary information sources, including driver's license and vehicle registration information from the Department of Motor Vehicles and criminal history and background information from the Wisconsin Department of Justice Crime Information Bureau. Before a dispatcher is permitted to access the TIME database, she must complete training and sign an agreement with the Wisconsin Department of Justice Crime Information Bureau. The Crime Information Bureau training includes information on the Driver's Privacy Protection Act. The Minocqua Police Department does not provide dispatchers with additional training on the Act. (By September 20, 2004, defendant Bresnahan had completed her training on the TIME system and was certified to access the database on behalf of the Minocqua Police Department.)

As required by defendant Town of Minocqua's agreement with the Wisconsin Department of Justice Crime Information Bureau, the Minocqua police department has entered into written agreements with many local law enforcement agencies so that they can gain access to the TIME database through Minocqua police dispatchers. By September 2004, six agencies, including the Town of Woodruff Police Department and the Wisconsin Department of Natural Resources, had signed agreements with the Minocqua police department to gain access to the database.

According to the agreement between the Minocqua Police Department and the Wisconsin Department of Justice Crime Information Bureau:

> Any individual authorized to use the TIME system who receives a request from any other individual for TIME system information must ensure that the person requesting the information is authorized to receive the data before disseminating data to another person. Each data service has its own rules for secondary dissemination of records.

### C. *September 20, 2004*

Defendant Bresnahan was on duty the afternoon of September 20, 2004. At 1:17 p.m., a woman (later identified through

deposition testimony as Freya Van Sky-hawk) called the dispatch center and asked, "Is there any way that I can find out a license plate, who the car is registered to?" In her career as a police dispatcher, defendant Bresnahan has fielded requests from members of the public for license plate information on only a few occasions. Therefore, she regarded the woman's call as unusual. Defendant Bresnahan informed the caller that the requested information was not available.

A short time later, at 1:36 p.m., defendant Clay Krietlow, an officer with the Woodruff police department, called defendant Bresnahan and asked her to "run a plate." Although defendant Kreitlow did not identify himself verbally, defendant Bresnahan recognized his voice from her frequent contacts with him. (Defendant Bresnahan has worked with defendant Kreitlow for eight years.) Defendant Krietlow did not explain to defendant Bresnahan why he was requesting the license plate information. Defendant Bresnahan accessed the TIME database and gave defendant Kreitlow plaintiff's name, vehicle description and address.

At 1:40 p.m., defendant Kreitlow called Bresnahan again and had the following conversation:

Bresnahan: Minocqua Police, Dawn.

Kreitlow: The reason I sounded so strange was . . .

Bresnahan: Yes.

Kreitlow: Andy Cator came in.

Bresnahan: Uh.

Kreitlow: With a plate number and wanted me to tell him who it belonged to.

Bresnahan: Oh, really?

Kreitlow: Yeah. So I, uh, you know he said, "Well I want to buy this guy's car."

Bresnahan: Um-hmm.

Kreitlow: And I'm like, "Well, I'm not going to tell you," I said. And he said, "Well, can you at least tell me if he's local?" And I said, "Well, give me the plate." That's why I—

Bresnahan: Mmm-hmm.

Kreitlow: —had you run it. This and that and I said, "Yeah, he's a local guy." That's [indiscernible].

Bresnahan: Oh, cause I had someone else call wanting me to run a plate because they wanted to know who it was. I said, "I won't do it."

Kreitlow: Was it four, four, zero, Frank, Mary, John?

Bresnahan: They never—We didn't even get to that point.

Kreitlow: Yep, it was probably him, then.

Bresnahan: No, it was a female.

Kreitlow: Oh. Could still be the same thing, though.

Bresnahan: Oh, sure, it's probably his girlfriend.

Kreitlow: Yeah. So I told him, I told him that the guy's local. I said, "That's all you're going to get." I said, "I'm not telling you who he is, where he lives, anything else."

Bresnahan: God, no.

Kreitlow: So, he said, "Well, I want to buy the guy's car." He was—

Bresnahan: Well, then, you should know who the guy is.

Kreitlow: Exactly. "Does it have a 'For Sale' sign on it? Is there a phone number on it? What?" He didn't answer me, so I said, "Okay. See you later. Goodbye."

Bresnahan: Yeah.

Kreitlow: You might want to leave a note for the next shift or whatever, just a little thing or whatever.

Bresnahan: Okay.

Kreitlow: He's trying to sniff for information.

Bresnahan: Yeah. He ain't going to get any.

Kreitlow: He was even asking who the third shift was here in Woodruff too and it's Rhodes so he's screwed there, too, so—

Bresnahan: He ain't going to get it from any of us.

Kreitlow: I know, but you know. That's just—

Bresnahan: He's an idiot.

Kreitlow: Let everybody know.

Bresnahan: Okay.

Kreitlow: Yeah, bye.

Bresnahan: Sure, bye.

Defendant Bresnahan did not know Cator personally but did know from her work as a dispatcher that he had a police record.

Immediately after ending her phone call with defendant Kreitlow, defendant Bresnahan told Minocqua Police Officer Brad Petersen that Cator was trying to obtain the name of the vehicle owner and instructed Petersen not to release the information. In addition, defendant Bresnahan contacted the Vilas County Sheriff's Department and warned it that "somebody was looking for" the license plate information.

At 1:42 p.m., defendant Thomas Kroeplin, a warden with the Department of Natural Resources, called the Minocqua dispatch center. (Defendant Kroeplin has been a conservation warden for twenty-six years. As a warden, he is considered a law enforcement agent and has the ability to conduct criminal investigations and make arrests. Defendant Bresnahan has worked with defendant Kroeplin for approximately eleven years.) Defendant Bresnahan answered defendant Kroeplin's call and had the following conversation with him:

Bresnahan: Minocqua Police, Dawn.

Kroeplin: Hi, Dawn. Tom Kroeplin.

Bresnahan: Hi, Tom.

Kroeplin: Can you run me a 28, please?

Bresnahan: Uh-oh.

Kroeplin: Uh-oh, what?

Bresnahan: Can I tell which 28 you're looking for?

Kroeplin: Go ahead.

Bresnahan: Four, four, zero, Frank Mary John.

Kroeplin: How did you figure that out?

Bresnahan: And I'm not giving it to you.

Kroeplin: Oh, okay.

Bresnahan: Because I was just warned somebody was looking for that plate.

Kroeplin: What's going on?

Bresnahan: He just wants to know because he's snooping.

Kroeplin: Ah.

Bresnahan: Because he says he wants to buy that vehicle, but he wants to know. And alls we tell him is it's a local.

Kroeplin: Okay.

Bresnahan: So I was advised. I cannot give this plate out.

Kroeplin: Ah.

Bresnahan: I'm sorry.

Kroeplin: I won't tell [him?].

Bresnahan: Alls it is is Bill Parus.

Kroeplin: Oh. Okay.

Bresnahan: But...

Kroeplin: They must be having a little bit of a squabble or something.

Bresnahan: I don't know what's going on there, but we're not giving it out. So you can't give it out.

Kroeplin: Nope. I won't.

Bresnahan: All right.

Kroeplin: Okay. Bye.

Bresnahan: Bye.

On September 20, 2004, defendant Bresnahan did not know that defendant Kroeplin was related to Cator.

At 2:10 p.m., defendant Bresnahan answered a 9–1–1 call from a woman who told Bresnahan that she wished to obtain a restraining order. Defendant Bresnahan told the woman that she would need to obtain a restraining order from the court and asked whether she was experiencing problems. The woman said she was.

In response to defendant Bresnahan's inquiry, the woman identified herself as Julie Erickson. Defendant Bresnahan asked whether "he [was] there right now," to which Erickson replied, "No, he just left." After obtaining Erickson's address, defendant Bresnahan asked Erickson how she was being threatened. Erickson stated that her ex-boyfriend, whom she identified later as Cator, would not leave her alone and had threatened to "bust up" her current boyfriend and prevent her from seeing her children. Erickson reported that Cator had broken a light at her home. When defendant Bresnahan learned the identity of Erickson's ex-boyfriend, she told Erickson she needed to place her call on hold briefly.

At 2:12 p.m., defendant Bresnahan used the police radio to dispatch Officer Petersen to Erickson's home. Petersen radioed dispatch to report his arrival at the Erickson residence several minutes later.

At 2:42 p.m., defendant Kroeplin called the dispatch center. Dispatcher Crystal Gillich answered the call, which went as follows:

Gillich: Minocqua Police, Crystal.

Kroeplin: Yeah, Crystal. Is, uh, huh, Dawn around yet?

Gillich: Yeah, hang on a second.

Kroeplin: Okay.

Bresnahan: Minocqua Police.

Kroeplin: Hey, Dawn.

Bresnahan: Yeah.

Kroeplin: Tom Kroeplin here.

Bresnahan: Yeah.

Kroeplin: This is a regular Peyton Place.

Bresnahan: Is what?

Kroeplin: I said, this is a real Peyton Place around here. Ah, I guess Brad's over at Andy's girlfriend's. Julie Erickson.

Bresnahan: Yeah.

Kroeplin: Okay.

Bresnahan: Yep, whole problem.

Kroeplin: Right. Ah, and Andy just left now, really going like a bat out of hell.

Bresnahan: From? From?

Kroeplin: From his home here on Seventy.

Bresnahan: On Seventy? Okay.

Kroeplin: I don't know if he's going over there. But I just wanted to . . . I don't think he is but just—

Bresnahan: Just out (?) Okay. Yeah. So yeah, that was obviously why he was trying to figure out that plate.

Kroeplin: Right.

Bresnahan: Mmm-hmm.

Kroeplin: I don't know.

Bresnahan: Yeah. So . . .

Kroeplin: Ah.

Bresnahan: You know, if he's try—You got to be careful with this 'cause you could tie us all in.

Kroeplin: Right, but he doesn't know who it is.

Bresnahan: Yeah, I know.

Kroeplin: I didn't tell him or anything like that.

Bresnahan: Right. Right.

Kroeplin: Ah [indiscernible]

Bresnahan: Okay. I'll, I'll let the officers know that he left.

Kroeplin: Just let them know that possibly he's going over there. I doubt it.

Bresnahan: Okay.

Kroeplin: Uh, cause my wife just got done talking to him and said "Stay away."

Bresnahan: Yeah.

Kroeplin: Let the courts handle it. If you got to fight over your child and stuff like that.

Bresnahan: Right.

Kroeplin: ... Pretty well, ah ... he was okay when she was talking to him, but like I said—

Bresnahan: Yeah, he peeled out, huh?

Kroeplin: He seemed like he was in a big hurry and—

Bresnahan: Well, I hope there's no more problems.

Kroeplin: I hope not.

Bresnahan: Yeah, okay.

Kroeplin: Just to let ya's know.

Bresnahan: All right. Thanks Tom.

Kroeplin: All right, bye.

At 2:47 p.m., defendant Kroeplin called the dispatch center again to report that Cator had returned home.

At no time on September 20, 2004 did defendant Bresnahan provide Cator with plaintiff's motor vehicle record information.

### D. *Epilogue*

At all times relevant to this lawsuit, Norbert McMahon served as the Minocqua police chief with responsibility for establishing the policies and procedures guiding the actions of the department's employees, including police dispatchers. After conducting an internal investigation of the events of September 20, 2004, McMahon and the Minocqua Police Department concluded that defendant Bresnahan's actions on September 20, 2004 were consistent with her training and with the department's policies and procedures.

At all times relevant to the claims against defendant Bresnahan described in plaintiff's complaint, Bresnahan was acting in the scope of her employment with the Minocqua Police Department.

### OPINION

The Driver's Privacy Protection Act of 1994 prohibits the release of a motorist's personal information (defined by 18 U.S.C. § 2725(3) as "information that identifies an individual, including an individual's ... name [and] address") from the Department of Motor Vehicles database, with specific, enumerated exceptions. 18 U.S.C. § 2721(a). Among those exceptions is § 2721(b)(1), which permits disclosure of personal information "for use by any government agency, including any ... law enforcement agency, for use in carrying out its functions." The Act does not specify what activities constitute the "carrying out" of "law enforcement functions."

Plaintiff contends that defendant Bresnahan, a Minocqua police dispatcher, violated the Driver's Privacy Protection Act when, for a non-law enforcement purpose, she disclosed plaintiff's motor vehicle record information to defendant Kroeplin, a warden with the Wisconsin Department of Natural Resources. Whether a police dispatcher can violate the Driver's Privacy Protection Act by relaying motor vehicle record information to a law enforcement officer who has requested the information is a question of first impression.

Congress passed the Driver's Privacy Protection Act of 1994 to limit the release of personal information contained in motor vehicle records. *Kehoe v. Fidelity Federal Bank & Trust,* 421 F.3d 1209, 1210 (11th Cir.2005). The legislation was introduced

in response to growing concern over crimes committed by individuals who used Department of Motor Vehicle records to identify and locate their victims. Deborah F. Buchman, Annotation, *Validity, Construction, and Application of Federal Driver's Privacy Protection Act, 18 U.S.C.A. §§ 2721 to 2725*, 183 A.L.R. Fed. 37 at § 2 (2005). The most notable of these crimes was the murder of actress Rebecca Schaeffer, who was killed when a stalker obtained her address from the California Department of Motor Vehicles. *See, e.g., Margan v. Niles*, 250 F.Supp.2d 63, 68–69 (N.D.N.Y.2003); 139 Cong. Rec. S15766 (Nov. 16, 1993) (remarks of Sen. Harkin); 140 Cong. Rec. H2527 (Apr. 20, 1994) (statement of Rep. Goss).

Although the Act was intended to "prevent stalkers, harassers, would-be criminals and other unauthorized individuals from obtaining and using personal information from motor vehicle records," it was not intended to impede the ability of law enforcement officers to carry out their duties. *Margan*, 250 F.Supp.2d at 68 (citing 140 Cong. Rec. H2527 (Apr. 20, 1994) (statement of Rep. Goss) ("[T]he intent of this bill is simple and straightforward: We want to stop stalkers from obtaining the name and address of their prey before another tragedy occurs ... [T]he Driver's Privacy Protection Act ... is a reasonable and practical crime fighting measure.")). Congressional hearing transcripts indicate that lawmakers discussed the breadth of access law enforcement officers should be given under the Act. Senator Harkin, who supported the bill, made the following statement:

Mr. President, I want to clarify my understanding of the provisions of the Driver's Privacy Protection Act concern-

ing law enforcement access to driver's personal information. Under section 2720(b)(2)[1], law enforcement agencies have unrestricted access to this information in carrying out its [sic] functions.

139 Cong. Rec. S15962 (Nov. 17, 1993) (remarks of Sen. Harkin). Senator Harkin went on to suggest that, "with respect to law enforcement agencies, [section 2721(b)(1) ] should be interpreted so as not to in any way restrict or hinder law enforcement and crime prevention strategies," even when those strategies might include releasing personal information to the general public. *Id.*

The Act includes a broad definition of the ability of law enforcement agencies to access and use motor vehicle record information. A law enforcement agency may use protected personal information so long as the agency is "carrying out" a law enforcement "function." § 2720(b)(1). Plaintiff contends that defendant Bresnahan was not carrying out a law enforcement function when she provided defendant Kroeplin with plaintiff's motor vehicle record information because she had reason to believe Kroeplin sought the information for personal reasons, rather than professional ones.

Plaintiff contends that a jury could reasonably infer from the undisputed facts that defendant Kroeplin requested plaintiff's motor vehicle record information in response to a request from his nephew, Andrew Cator and that this would have been an impermissible purpose under the Act. I agree that such an inference is permissible and have already denied defendant Kroeplin's motion for summary judgment on that ground. However, whether defendant Kroeplin requested

---

**1.** This provision was renumbered in the final version of the Driver's Privacy Protection Act as section 2721(b)(1).

plaintiff's information from defendant Bresnahan for a non-law enforcement purpose is a separate question from whether defendant Bresnahan performed a law enforcement function when, as a police dispatcher, she relayed information to a law enforcement officer that he had requested and to which he would have been entitled if his request were indeed legitimate. Plaintiff has confounded these lines of inquiry and in doing so has overlooked a critical distinction between the roles played by defendant Bresnahan and defendant Kroeplin.

Had defendant Kroeplin told defendant Bresnahan that he was seeking plaintiff's motor vehicle record information in order to pass the information along to his nephew, the spurned lover of the vehicle owner's girlfriend, and had Bresnahan then proceeded to disclose plaintiff's information, plaintiff would have a strong argument that Bresnahan was not performing a law enforcement function when she released the information. However, those are not the facts before this court. Instead, it is undisputed that within a span of less than thirty minutes, three separate individuals, one civilian and two law enforcement officers, requested plaintiff's motor vehicle record information from defendant Bresnahan. She refused to provide the information to the civilian but provided it promptly to the first officer, defendant Kreitlow. When a second officer, defendant Kroeplin, requested the same information, defendant Bresnahan hesitated before providing him with plaintiff's information. When she did disclose the information, she gave defendant Kroeplin the same admonition defendant Kreitlow had given her: "We're not giving it out, so you can't give it out." When defendant Kroeplin contacted defendant Bresnahan one hour later to report that Cator had taken off like a "bat out of hell," defendant Bresnahan stated, "You got to

be careful with this 'cause you could tie us all in." At her deposition, defendant Bresnahan testified that she made the statement "to remind" defendant Kroeplin that it would be improper for a law enforcement agent to disseminate plaintiff's information to a non-law enforcement agent. Bresnahan Dep., dkt. # 98, at 33. Although plaintiff contends that defendant Kroeplin's purpose for requesting the information was obviously personal, the facts do not support such an assertion. Drawing all inferences in plaintiff's favor, at worst the purpose of defendant Kroeplin's inquiry was questionable.

If the court were to hold that defendant Bresnahan's actions could be found to violate the Driver's Privacy Protection Act, police dispatchers would be required to second-guess the requests of law enforcement officials any time an officer requested protected information in a manner deemed by the dispatcher to be less than obvious or routine. Plaintiff concedes as much by suggesting that defendant Bresnahan should "at least have asked Kroeplin why he wanted the plate owner information before giving it to him." Plt.'s Br., dkt. # 119, at 9. If the court were to adopt plaintiff's position, the practical effect would be that untrained civilian employees would be required *by law* to delay the receipt of critically important information by trained police officers working under difficult and sometimes life-threatening conditions. Nothing in the text or history of the Driver's Privacy Protection Act that would justify such a result.

Therefore, I conclude that the undisputed facts demonstrate that defendant Bresnahan engaged in a law enforcement function when she provided plaintiff's motor vehicle record information to defendant Kroeplin, at his request. Because defendant Bresnahan did not violate the Act when she disclosed plaintiff's motor vehicle

record information to defendant Kroeplin, I need not address her argument that qualified immunity bars plaintiff's claims against her in her personal capacity. Defendants Bresnahan's and Town of Minocqua's motion for summary judgment will be granted.

### ORDER

IT IS ORDERED that

1) The motion for summary judgment filed by defendants Bresnahan and Town of Minocqua is GRANTED.

2) Defendants Bresnahan and Town of Minocqua are dismissed from this lawsuit.