JOHN NITTINGER; DALE ROEKER; ROBERT MARTINEZ; COAST HOTELS AND CASINOS, INC., FKA COAST OP–ERATING COMPANY, AND GOLD COAST HOTEL AND CASINO, A NEVADA LIMITED PARTNERSHIP, DBA GOLD COAST HOTEL AND CASINO; GAUGHAN-HERBST, LIMITED, AND GAUGHAN-HERBST, INC., DISSOLVED AND MERGED INTO COAST RESORTS, INC., A NEVADA CORPORATION, APPELLANTS, v. DEDRIC HOLMAN AND CHRISTINA EDWARDS, RESPONDENTS.

No. 34917

May 30, 2003                                           69 P.3d 688

[Rehearing denied August 29, 2003]

*Beckley Singleton, Chtd.,* and *Daniel F. Polsenberg,* Las Vegas, for Appellants.

*Leo P. Flangas,* Las Vegas, for Respondents.

Before the Court EN BANC.

## OPINION

By the Court, SHEARING, J.:

This is an appeal from a judgment on a jury verdict in an action for battery and false imprisonment awarding compensatory and punitive damages and from the denial of a motion for a new trial. Appellants' principal argument is that the corporation is not liable for punitive damages based on the actions of its security officers. We agree, but affirm the remainder of the judgment and the order denying a new trial.

### FACTS

In the early morning hours of February 19, 1994, respondents, Dedric Holman, an African-American man, and Christina Edwards, a Caucasian woman, went gambling at the Gold Coast Hotel and Casino, operated by appellant, Coast Hotels and Casinos, Inc. (Gold Coast). Edwards separated from Holman. A short time later, a casino employee asked to see her identification, as she appeared to be underage. Edwards had forgotten her identification at work and agreed to leave the casino to retrieve it. Edwards found Holman and asked him to drive her to her workplace. Holman said he would do so after one more hand of blackjack.

Appellant John Nittinger, a security guard, approached and asked Edwards for her identification. According to Edwards and

Holman, when Edwards explained that she was making arrangements to get it, Nittinger, using profanity, told her to leave immediately. Holman and Nittinger started to argue, and Nittinger repeatedly told Holman and Edwards to leave the casino. Holman took his chips and proceeded toward the cashier. A physical confrontation ensued between Nittinger and Holman.

Appellant Dale Roeker, another security guard, subdued Edwards and frisked her. Edwards testified that Roeker patted down her entire body, including her breasts and crotch. Edwards testified that Roeker also made derogatory comments about her dating Holman. Roeker and Rodney Wilson, another guard, escorted Edwards outside, placed her in handcuffs, and waited for the police.

Meanwhile, Holman and Nittinger were involved in a fistfight. Holman then tried to run, with security officers in pursuit. A casino employee tripped Holman. Nittinger, appellant Robert Martinez, and another guard held Holman on the ground. Holman testified that the guards then punched, kicked, and beat him with nightsticks while Sergeant Michael Malloy, the security shift supervisor, watched.

Holman testified that the guards then hog-tied him and carried him into a truck, where Martinez said, "If you think we beat your black ass now, wait until we get you around to the back." The guards drove Holman to a security office where, Holman testified, they continued to beat him. Holman remained in the office until the police arrived approximately three hours later. Holman spit up a substantial amount of blood while in the security office. Holman testified that the guards also stole money from his wallet and throughout the incident used racial slurs, including "nigger." Malloy was present during part of this incident.

Independent witnesses at the casino testified that Holman was beaten after he was handcuffed. Holman also presented medical testimony as to the severity of his injuries. The guards testified, denying the beating, the sexual touching, and the racial comments.

Richard Whitaker, the Gold Coast's director of security, testified concerning the Gold Coast's three-tiered, progressive-force policy. First, a guard is to ask a troublesome customer to leave. If the customer refuses, the guards are to lead him by the arm toward the exit. If the customer becomes violent, the guards are to force him to the floor and lie atop him until he ceases struggling. At this point, the guards are to handcuff the customer and lead him to a security area, where he is to remain until police arrive. The Gold Coast charged Malloy, as security supervisor, with implementing this policy and ensuring that the guards followed it. Although Malloy reported to higher-ranking security personnel, his superiors were not at the casino the night of the incident. Thus, Malloy had control over all security operations in the casino at the time.

The jury awarded Holman $178,000 in compensatory damages against Nittinger, Martinez, and the Gold Coast, $1,500 in punitive damages against Nittinger, $1,200 in punitive damages against Martinez, and $279,000 in punitive damages against the Gold Coast. The jury awarded Edwards $20,000 in compensatory damages against Roeker and the Gold Coast, $1,000 in punitive damages against Roeker, and $93,000 in punitive damages against the Gold Coast. The appellants moved for a new trial, which the district court denied. They now appeal the judgment on the jury verdict and the order denying their motion for a new trial.

## DISCUSSION

Appellants' principal arguments relate to the award of punitive damages against the Gold Coast. The district court instructed the jury that it could find the Gold Coast liable for punitive damages if a managerial agent authorized or ratified the guards' conduct, and if malice was proven by clear and convincing evidence. The respondents argue that Malloy, who was in charge of security operations at the time of the incident, was a managerial agent. The Gold Coast argues that Malloy was not a managerial agent so as to subject the Gold Coast to punitive damages based on his conduct.

In *Smith's Food & Drug Centers v. Bellegarde,*[1] this court adopted the standard set forth in *Restatement (Second) of Torts* § 909 (1979). This section provides:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
> (a) the principal or a managerial agent authorized the doing and the manner of the act, or
> (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
> (d) the principal or a managerial agent of the principal ratified or approved the act.[2]

No evidence was presented to establish that subsections (a), (b), or (c) are implicated in this case. Accordingly, the Gold Coast's liability for punitive damages depends upon Malloy's being a managerial agent under subsection (d). Thus, the issue is whether, on the night in question, Malloy had the authority to ratify or approve the acts of the security guards.

[1]114 Nev. 602, 610-11, 958 P.2d 1208, 1214 (1998).

[2]*Restatement (Second) of Torts* § 909 (1979). This section is identical to section 217C of the *Restatement (Second) of Agency* (1958).

The philosophy behind the *Restatement* position is that a corporation should not be liable for punitive damages for the acts of its agents absent corporate culpability. However, subsection (d) provides an exception. Comment b to section 909 states the reason for subsection (d) as follows:

> Although there has been no fault on the part of a corporation or other employer, if a person acting in a managerial capacity either does an outrageous act or approves of the act by a subordinate, the imposition of punitive damages upon the employer serves as a deterrent to the employment of unfit persons for important positions.

The *Restatement* does not define a managerial agent. Neither the comment nor the illustrations under section 909 clarify whether a person in charge of security at a business would be considered a managerial agent. In *Egan v. Mutual of Omaha Insurance Co.*, the Supreme Court of California stated:

> The determination whether employees act in a managerial capacity . . . does not necessarily hinge on their ''level'' in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.[3]

Other cases that have considered who qualifies as a managerial agent have followed *Egan* and have emphasized the discretion or policy-making authority that the agent is granted. In *Albuquerque Concrete v. Pan Am Services,* the New Mexico Supreme Court stated:

> A key in determining whether an agent acts in a managerial capacity is to look at the nature of what the agent is authorized to do by the principal and whether the individual has discretion regarding both what is done and how it is done. Job titles, in and of themselves, are not necessarily dispositive.[4]

The judge in *Steinhoff v. Upriver Restaurant Joint Venture* summed up his conclusion regarding a managerial agent as follows:

> Having reviewed many cases interpreting § 909 this court believes the following quotation exemplifies the correct criteria:

---

[3]620 P.2d 141, 148 (Cal. 1979).

[4]879 P.2d 772, 777 (N.M. 1994); *see also Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 188 F.3d 278, 284 (5th Cir. 1999).

"The fact that [an employee] described herself as a 'manager' is not evidence of the type of managerial capacity that the law requires to charge an employer punitively with the conduct of a managerial agent. *For such to occur, the managerial agent must be of sufficient stature and authority to have some control and discretion and independent judgment over a certain area of [the] business with some power to set policy for the company.*"[5]

In *Bellegarde,* we upheld an award of punitive damages when an acting store manager oversaw security guards' tortious mistreatment of a suspected shoplifter.[6] We emphasized the manager's lack of training and the lack of a policy regarding shoplifters.[7] In other words, the corporation was held liable because the corporation had given the acting store manager total discretion to determine "what is done and how it is done,"[8] even though she was not a part of the management that ordinarily would have determined corporate policy.

In this case, the Gold Coast presented evidence of its progressive-force policy established by its management regarding the treatment of patrons. Clearly, the jury did not believe that the policy was followed. Substantial evidence supports that finding, including testimony of other Gold Coast patrons. Malloy was charged with responsibility for security in the casino at the time of the incident, implementing the Gold Coast's progressive-force policy, and ensuring that the guards obeyed it. Malloy was apparently present during much of the guards' tortious and malicious misconduct. Although Malloy testified that he did not see any misconduct, the jury could choose not to believe him and to believe the other witnesses. Malloy had the power and responsibility to stop the beating and other tortious conduct, but did not do so. The jury could find, under these facts, that Malloy ratified or approved the conduct. Since the Gold Coast had charged him with this responsibility that evening and he did not fulfill it, the hotel can be held liable for the compensatory damages to Holman and Edwards. However, for purposes of imposing punitive damages on

---

[5] 117 F. Supp. 2d 598, 604-05 (E.D. Ky. 2000) (alteration in original) (quoting *Fitzgerald v. Mountain States Tel. & Tel. Co.,* 46 F.3d 1034, 1045 n.24 (10th Cir.) (emphasis added) (citations omitted), *vacated on rehearing,* 60 F.3d 837 (10th Cir. 1995)).

[6] 114 Nev. at 611, 958 P.2d at 1214.

[7] *Id.*

[8] *Id.*

the Gold Coast, Malloy must be a managerial agent, which the evidence does not establish.

There is no evidence that Malloy had the authority to deviate from the established policy or that he had any discretion or could exercise his independent judgment. The evidence indicates that he merely had the authority to implement the Gold Coast's policy and to see that the security guards enforced it. Therefore, he would not be classified as a managerial agent under section 909(d) of the *Restatement (Second) of Torts* so as to subject the Gold Coast to liability for punitive damages for his actions or inactions on the night in question.[9]

The fact that Malloy was a supervisor was not enough to grant him that status. In *White v. Ultramar, Inc.,* the California Supreme Court clarified the *Egan* definition of managerial agent:

> If we equate mere supervisory status with managing agent status, we will create a rule where corporate employers are liable for punitive damages in most employment cases. Such a rule would ignore *Egan*'s sound reasoning . . . and end our emphasis on the limited role and deterrent purpose of punitive damages awards: "to punish wrongdoers and thereby deter the commission of wrongful acts."[10]

We reverse the portion of the judgment imposing punitive damages on the Gold Coast and affirm the remainder of the judgment and the order denying a new trial.[11] This case is remanded to the district court for amendment of the judgment and recalculation of interest.

AGOSTI, C. J., BECKER and GIBBONS, JJ., concur.

ROSE, J., with whom LEAVITT and MAUPIN, JJ., agree, concurring in part and dissenting in part:

I join with the majority's affirmance of the general damages verdict, but I believe that the majority defines the term "managerial agent," as used in the *Restatement (Second) of Torts* § 909 (1979), too narrowly; and by doing so, it improperly strikes the punitive damages award.

---

[9]None of the cases cited by the dissent supports the view that just because an agent is a supervisor, the agent is a "managerial agent." Both *Ramos v. Frito-Lay, Inc.,* 784 S.W.2d 667, 669 (Tex. 1990), and *Albuquerque Concrete v. Pan Am Services,* 879 P.2d 772, 778 (N.M. 1994), emphasize the discretion and authority that the agent had within the company. *People v. East-West University, Inc.,* is a criminal case and has no applicability here. 516 N.E.2d 482 (Ill. App. Ct. 1987).

[10]981 P.2d 944, 953 (Cal. 1999) (quoting *Neal v. Farmers Ins. Exchange,* 582 P.2d 980, 990 n.13 (Cal. 1978)).

[11]We conclude that the other issues raised by the appellants have no merit.

The majority correctly references section 909 and its comment, but then declines to follow the general statements therein. Comment b states that a person acting in a managerial capacity can expose the corporation to punitive damages for malicious or outrageous acts if he or she approves of the act by a subordinate. There is ample evidence in the record to establish that Malloy approved the heinous acts by simply standing by and permitting the violent conduct by the employees he was supervising. Nowhere in section 909 or the comment does it state that a managerial agent must have policy-making authority or discretion to make ad hoc policy or corporate decisions.

Obviously, a manager who has the authority to make policy decisions and discretion to follow or abrogate corporate rules would be someone who is a managerial agent, but it does not follow that managers and supervisors who do not have this power or discretion cannot also be considered managerial agents.

Several courts have interpreted the term ''managerial agent'' to logically include those employees who manage or are in supervisory positions and are charged with enforcing a corporation's rules and policies. For example, in *Ramos v. Frito-Lay, Inc.,*[1] the Texas Supreme Court concluded that an employee with the title of district sales manager and supervisory authority over twelve employees was employed in a managerial capacity; and thus, the punitive damages award against Frito-Lay was proper. Also, in *Albuquerque Concrete v. Pan Am Services,*[2] the Supreme Court of New Mexico concluded that ''when a corporate agent with managerial capacity acts on behalf of the corporation, pursuant to the theoretical underpinnings of the Restatement rule of managerial capacity, his acts are the acts of the corporation; the corporation has participated.'' The court observed that managerial agents could be those who enforce or effectuate corporate policies and rules.[3] Moreover, in *People v. East-West University, Inc.,*[4] the Illinois Court of Appeals noted that one who has supervision of subordinate employees in a managerial capacity should be included in the definition of managerial agent.

This interpretation of the term ''managerial agent'' is in accordance with our prior decision in *Smith's Food & Drug Centers v. Bellegarde,* where we observed:

''In determining whether an agent acts in a managerial capacity, [the key] is to look to what the individual is authorized to do by the principal and to whether the agent has discretion

[1] 784 S.W.2d 667, 669 (Tex. 1990).

[2] 879 P.2d 772, 778 (N.M. 1994).

[3] *Id.* at 777 (noting that a managerial employee is defined as one who formulates, determines, and effectuates his employer's policies).

[4] 516 N.E.2d 482, 485 (Ill. App. Ct. 1987).

as to what is done and how it is done. Job titles . . . should be of little importance."[5]

Thus, a managerial agent can be a corporate employee who is in a supervisory position, as is the case here. Malloy was the acting supervisor of security employees when the incidents with Holman and Edwards occurred and was in charge of supervising the security employees and enforcing the corporation's progressive-force policy. He obviously had substantial discretion in enforcing corporate policy. Malloy was present during much of the security guards' tortious misconduct and had the power and responsibility to stop it. Given his supervisory position and his power to enforce corporate policy, Malloy should be considered a managerial agent for the Gold Coast.

The majority narrowly construes the term "managerial agent" by requiring that he or she possess policy-making authority or ad hoc discretion to make corporate rules and decisions. This restricts the imposition of punitive damages to instances where officers, directors, and a few upper-level executives are involved, assuming these corporate actors even have such authority. The majority cites with approval *Albuquerque Concrete,* which disapproved of the very restriction the majority now adopts:

> In the modern world of multinational corporations, corporate control must be delegated to managing agents who may not possess the requisite upper-level executive authority traditionally considered necessary to trigger imposition of corporate liability for punitive damages. If we were to adopt the position that misconduct by managing agents who actually control daily operations is not sufficient to trigger corporate punitive damages, large corporations that routinely delegate managerial authority to shape corporate policy by making important corporate decisions could unfairly escape liability for punitive damages by virtue of their size.[6]

The practical effect of the majority decision will be to insulate corporations from punitive damages for the vast majority of acts of malice or outrageous behavior committed by their supervisors and managers. This is bad law and poor public policy. At a time when we have seen many illegal and outrageous acts committed by corporate America, it is not appropriate to reduce corporate responsibility for such egregious action.

Therefore, I respectfully concur in part and dissent in part, and I would affirm the punitive damages award against the Gold Coast.

---

[5]114 Nev. 602, 611, 958 P.2d 1208, 1214 (1998) (quoting J. Ghiardi & J. Kirchner, *Punitive Damages Law and Practice,* ch. 24, at 15 (1987)).

[6]879 P.2d at 778 (internal citation omitted).