ASAP STORAGE, INC., DBA QUICKSPACE; J & J MECHAN-
ICAL, INC., A NEVADA CORPORATION; SIERRA DIGITAL,
INC., A NEVADA CORPORATION; INCLINE GLASS, INC., A
NEVADA CORPORATION; MCBRIDE MACHINE, INC.,
A NEVADA CORPORATION; FUNDIS COMPANY, A NEVADA
CORPORATION; NEVCAL TRANSPORTATION SERVICES,
INC., A NEVADA CORPORATION; AND F & M PROPERTIES,
A PARTNERSHIP, APPELLANTS, v. THE CITY OF SPARKS,
RESPONDENT.

No. 45756

December 27, 2007 173 P.3d 734

[Rehearing denied February 21, 2008]

*Calvin R.X. Dunlap and Associates* and *Monique Laxalt* and
*Calvin R.X. Dunlap*, Reno, for Appellants.

*Stanley H. Brown Jr.*, Reno; *Chester H. Adams*, City Attorney,
Sparks, for Respondent.

Before the Court EN BANC.

# OPINION

By the Court, GIBBONS, J.:

This appeal arises from a storm-induced flood that occurred in Sparks, Nevada, on January 1, 1997. During the storm, respondent City of Sparks (the City) evacuated appellants' businesses, barricaded the street entrance to their businesses, and denied them access to their businesses. Consequently, appellants were unable to remove their property before the flood waters destroyed it. Appel-

lants contend that they could have saved their property if the City had allowed them access to their businesses.

Three main issues are raised on appeal. First, we consider whether appellants produced sufficient evidence in support of their takings claim under Article 1, Section 8 of the Nevada Constitution. In analyzing their takings claim, we undertake two distinct sub-inquiries: (a) whether appellants' real and personal property constitutes "private property" under the Nevada Constitution, and (b) whether the City's actions that denied appellants access to their businesses constituted a "taking" under the terms of the Nevada Constitution. With respect to these sub-inquiries, we conclude that (a) appellants' real and personal property constitute private property under the Nevada Constitution, and (b) the City's erection of a barricade was only a temporary interference with appellants' property rights and did not rise to the level of a taking. Thus, the district court properly granted summary judgment to the City on appellants' Article 1, Section 8 takings claim.

Second, we consider whether appellants produced sufficient evidence to support their tort claims and to defeat summary judgment. When analyzing appellants' tort claims, we again undertake two distinct sub-inquiries: (a) whether NRS 414.110 provides the City with immunity for pre-emergency negligence, gross negligence, or willful misconduct; and (b) whether NRS 414.110 provides the City with immunity for negligence, gross negligence, or willful misconduct during emergency management activities. We conclude that NRS Chapter 414 facially immunizes the City from liability for acts that constitute either preparing for an emergency or carrying out emergency functions. In reaching this conclusion, we overrule, in part, our previous holdings in *Nylund v. Carson City*[1] and *Vermef v. City of Boulder City*,[2] which determined that immunity for pre-emergency negligence turned on whether this negligence exacerbated damages that resulted from negligent emergency management. Instead, pre-emergency immunity depends on whether the government acts were undertaken in preparation for an emergency. As neither the parties nor the district court had the opportunity to consider the City's pre-emergency activities under the proper statutory framework, we reverse that portion of the district court's order relating to pre-emergency activities and remand for further proceedings.

We also conclude that although NRS 414.110(1) plainly immunizes the City from tort liability for activities related to emergency preparation and its actions in handling emergencies, the statute contains a latent ambiguity, as it does not immunize city workers' acts of gross negligence, intentional misconduct, or bad faith. This

[1]117 Nev. 913, 34 P.3d 578 (2001).

[2]119 Nev. 549, 80 P.3d 445 (2003).

discrepancy may subject the City to vicarious liability for its workers' non-immunized acts. We need not reach this issue, however, because, in its answer and summary judgment motion, the City also relied on discretionary-function immunity under NRS 41.032(2). In rendering summary judgment on the City's liability for its activities related to emergency management, the district court relied solely on NRS 414.110(1) and did not consider the application of NRS 41.032(2). Immunity under this provision should be considered, however, because it may render moot the issue of the City's potential vicarious liability. Thus, on remand, the district court is instructed to analyze immunity under NRS 41.032(2).

Third, with respect to whether appellant ASAP Storage, Inc., produced sufficient evidence to create a genuine issue of material fact in support of its breach-of-contract claim, the district court's order granting summary judgment did not "set forth the undisputed material facts and legal determinations" regarding ASAP Storage's breach-of-contract claim as required by NRCP 56(c). Accordingly, we reverse the portion of the district court's order relating to this claim. On remand, should the district court conclude that summary judgment is warranted on this claim, then it must set forth the information necessary under NRCP 56(c).

## FACTUAL BACKGROUND

Appellants are six business owners with properties located in an industrial area in Sparks, Nevada. During a flood on January 1, 1997, appellants suffered damage to their real and personal property.

Before that flood, the City took four actions that are relevant to appellants' case. First, the City approved Sierra Chemical's special use application to store hazardous materials, "hazmat," in the City's industrial area. This industrial area lies in a known flood plain. At the time the City approved the hazmat sites, it understood that if flooding occurred, the sites could contaminate the surrounding area. Second, the City lowered the elevation of a bridge that was adjacent to a levee that protected the industrial area. Due to the bridge's lower elevation, high flood waters could more easily breach the levee and enter the industrial area. Third, the City required ASAP Storage to install a sunken drain in the middle of the industrial area. During the flood, waters entering the drain system overflowed into the industrial area, possibly aggravating the effects of the flood. Fourth, and finally, the City required ASAP Storage to accept a flood evacuation plan as a condition of receiving its business permit. Ultimately, the City precluded ASAP Storage from entering its property to implement the evacuation plan. ASAP Storage claims that it could have saved its personal property if the City had fulfilled its contractual obligations under the evacuation plan.

One day before the flood, the City Manager rejected a proposal to set up an emergency command center, even though the City expected flooding. The City Manager did so knowing of the potential danger for the release of toxic materials in the industrial area if that area flooded. On the day of the flood, but before flooding began, the City Manager declared a state of emergency and ordered that parts of the city, including the industrial area, be evacuated and barricaded. During the evacuation, the City did not permit ASAP Storage to evacuate according to the previously accepted evacuation plan. Because the City barred them from their businesses, appellants could not remove their personal property before the flood reached it. As a result, the flood waters damaged their personal property. The City allowed appellants to re-enter their properties after barricading the industrial area for approximately 48 hours.

Thereafter, appellants sued the City for (1) negligence, gross negligence, and willful misconduct (both before and during the flood) and (2) a violation of Article 1, Section 8, Clause 6 of the Nevada Constitution (the takings clause). ASAP Storage also sued the City for breach of contract arising from the City's failure to allow ASAP Storage to implement its city-mandated evacuation plan. The City moved for summary judgment, arguing that it was immune from liability under NRS Chapter 414 (Nevada's Emergency Management Act). The district court granted the City summary judgment, concluding that the City was immune from suit and that no taking had occurred. This appeal followed.

## DISCUSSION

This court reviews de novo an order granting summary judgment.[3] As this court has previously recognized, "[s]ummary judgment is appropriate and 'shall be rendered forthwith' when the pleadings and other evidence on file demonstrate that no 'genuine issue as to any material fact [remains] and that the moving party is entitled to a judgment as a matter of law.' "[4] Statutory interpretation is a question of law and is also reviewed de novo.[5]

*The City is not obligated to compensate appellants under Article 1, Section 8, Clause 6 of the Nevada Constitution*

Appellants claim that the City's temporary evacuation and barricading of the industrial area during a time of great public peril constituted a taking of private property for public use under the takings clause of the Nevada Constitution. Therefore, they further

---

[3]*Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005).

[4]*Id.* (quoting NRCP 56(c) (alteration in original)).

[5]*Nylund*, 117 Nev. at 915-16, 34 P.3d at 580.

argue that the City must pay them just compensation for their property that was damaged during the flood. Because no taking occurred, we disagree.

The Nevada Constitution states that "[*p*]*rivate property* shall not be taken for public use without just compensation having been first made, or secured, except in cases of war, riot, fire, or great public peril, in which case compensation shall be afterward made."[6] Since that provision, by its terms, applies only to private property, our inquiry begins with whether appellants' property that was allegedly taken by the City constitutes private property under the Nevada Constitution.

### The "private property" requirement

#### Real property satisfies the "private property" requirement

The term "private property" requires that an individual have a property interest in order to assert a takings claim.[7] It is well established that an individual's real property interest in land supports a takings claim.[8] Thus, we conclude that appellants' real property satisfies the takings clause's private property requirement in this case. We next turn to the issue of whether appellants' personal property satisfies the takings clause's private property requirement.

#### Personal property satisfies the "private property" requirement

The issue of whether appellants' personal property satisfies the takings clause's private property requirement is a question of first impression for this court. Appellants assert that tangible and intangible property, as well as real property, may all be the subject of a takings claim. We take this opportunity to address whether the Nevada Constitution's takings clause extends to personal property. We conclude that it does.

To determine the meaning of Article 1, Section 8, Clause 6 of Nevada's Constitution, we give that provision its plain effect, un-

---

[6]Nev. Const. art. 1, § 8, cl. 6 (emphasis added).

[7]*McCarran Int'l Airport v. Sisolak*, 122 Nev. 645, 658, 137 P.3d 1110, 1119 (2006), *cert. denied*, 549 U.S. 1206 (2007).

[8]*See* NRS 37.030(1); *Sisolak*, 122 Nev. at 675, 137 P.3d at 1130 (aircraft flying over plaintiff's land); *Clark County v. Alper*, 100 Nev. 382, 385, 685 P.2d 943, 945 (1984) ("a strip of land 50 by 1,000 feet in dimension").

less the language is ambiguous.[9] If a constitutional provision's language is ambiguous, meaning that it is susceptible to "two or more reasonable but inconsistent interpretations,"[10] a court may look to the provision's history, public policy, and reason to determine what the Nevada Constitution's framers intended.[11] Conversely, when a constitutional provision's language is clear on its face, we may not go beyond that language in determining the framers' intent.[12] Whatever meaning ultimately is attributed to a constitutional provision may not violate the spirit of that provision.[13]

Here, the term "private property" in Nevada's takings clause is plain on its face; thus, we need not go beyond its language. Specifically, that provision broadly applies to all types of privately owned "property" and includes no language to justify excluding personal property from its scope. Further, to define "private property" as not applying to personal property is not a reasonable alternative interpretation. To construe Nevada's takings clause in that way would imply either that the government may take personal property for public use without compensating the owner or that the government could never, not even in emergencies, take personal property for public use. Either construction would undermine the spirit of that provision, which we recently have noted "contemplates expansive property rights" and provides the foundation of Nevada's "rich history of protecting private property owners against government takings,"[14] while allowing for public safety and police powers.[15]

Further, interpreting the takings clause's use of the term "private property" as excluding personal property from its scope is inconsistent with other provisions in Nevada's Constitution in which the framers distinguished the various forms of property—*i.e.*, if the framers intended to limit the meaning of "private property," they would have employed language doing so, as they did in other parts

---

[9]*See McKay v. Bd. of Supervisors*, 102 Nev. 644, 648, 730 P.2d 438, 440 (1986); *see also Rogers v. Heller*, 117 Nev. 169, 176 n.17, 18 P.3d 1034, 1040 n.17 (2001) (recognizing that the rules of statutory construction apply when interpreting constitutional provisions).

[10]*Gallagher v. City of Las Vegas*, 114 Nev. 595, 599, 959 P.2d 519, 521 (1998).

[11]*McKay*, 102 Nev. at 649, 730 P.2d at 442; *see also Beazer Homes Nevada, Inc. v. Dist. Ct.*, 120 Nev. 575, 582, 97 P.3d 1132, 1137 (2004).

[12]*McKay*, 102 Nev. at 648, 730 P.2d at 441.

[13]*Id.*

[14]*McCarran Int'l Airport v. Sisolak*, 122 Nev. 645, 670, 137 P.3d 1110, 1127 (2006), *cert. denied*, 549 U.S. 1206 (2007).

[15]*See Zale-Las Vegas v. Bulova Watch*, 80 Nev. 483, 501, 396 P.2d 683, 693 (1964) (recognizing that the Legislature's police power is "great indeed" and "essential" for "the protection and preservation of the public safety").

of Nevada's Constitution.[16] Accordingly, we conclude that the term "private property" in Nevada's takings clause necessarily includes personal property.

### The "taking" requirement

Appellants contend that the City's decision to barricade the streets and deny them entrance to their businesses for 48 hours during a flood was a taking. In determining whether the taking requirement is satisfied, we first examine whether appellants had a protected property interest, and if so, we then consider whether the City's actions constituted a taking of that interest.

For a taking to occur, a claimant must have a " 'stick in the bundle of property rights.' "[17] The bundle of property rights includes "all rights inherent in ownership, including the inalienable right to possess, use, and enjoy the property."[18]

Appellants owned the land underlying their businesses and the personal property contained inside. Their ownership interest carried with it the right to possess, use, enjoy, and protect that property.[19] Consequently, appellants had a protected property interest in their land, buildings, and the chattels contained therein. We thus consider whether the City engaged in a taking when it denied appellants access to their properties.[20]

A taking can arise when the government regulates or physically appropriates an individual's private property. Physical appropriation exists when the government seizes or occupies private property or ousts owners from their private property.[21]

Initially, we note that this matter does not involve an alleged taking based on government regulations, and the City did not physi-

---

[16]*See* Nev. Const. art. 10, § 1, cl. 1 (providing that "[t]he Legislature shall . . . secure a just valuation of all property, real, personal[,] and possessory"); *cf. U.S. Design & Constr. v. I.B.E.W. Local 357*, 118 Nev. 458, 461, 50 P.3d 170, 172 (2002) (recognizing that an ambiguous provision's meaning may be determined from the entire statutory scheme).

[17]*Sisolak*, 122 Nev. at 658, 137 P.3d at 1119 (quoting *Karuk Tribe of California v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000)).

[18]*Id.*; *see* Nev. Const. art. 1, § 1 (granting the inalienable constitutional right to "[p]rotect[ ]" property).

[19]*Sisolak*, 122 Nev. at 658, 137 P.3d at 1119.

[20]*Karuk*, 209 F.3d at 1374 (recognizing that if a claimant possesses a "stick" in the bundle of property rights, a court must "determine[ ] whether the governmental action at issue constituted a taking of that 'stick' '").

[21]*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

cally seize or occupy appellants' private property. Thus, appellants' takings claim can only succeed if they can demonstrate that the City physically appropriated their private property by ouster when the City barred them from entering their properties during the flood.

A physical appropriation by ouster occurs when the government substantially interferes with an owner's right of access to his or her property.[22] To determine whether a substantial interference occurred in this instance, we necessarily turn to case law because no statutory or constitutional authority governs our analysis.

Appellants rely on this court's decision in *Culley v. County of Elko*[23] for the proposition that substantial impairment of an owner's right of ingress and egress constitutes a substantial interference with the owner's right of access. In *Culley*, landowners lived adjacent to an airport.[24] After the airport extended its runway across the landowners' access road, they were forced to use a less convenient, more circuitous route, which caused their property values to decrease by 50 percent.[25] The landowners filed an inverse condemnation action, claiming that the government's actions constituted a substantial impairment of their property rights.[26] Subsequently, the district court dismissed their takings claims under NRCP 41(b).[27] This court concluded that the district court erred in dismissing the landowners' takings claims because the district court could not have found as a matter of law that a substantial impairment did not exist.[28]

Appellants also rely on this court's more recent decision in *Argier v. Nevada Power Co.*[29] In that case, the government entered onto the landowners' property and installed permanent power lines. Before the district court determined the value of the taking, the landowners sold the property.[30] This court concluded that a substantial interference occurred when the government was granted immediate occupancy to install the power lines and that the

---

[22]*Culley v. County of Elko*, 101 Nev. 838, 841, 711 P.2d 864, 866 (1985) (concluding that "[t]he district court correctly held that the court must determine whether substantial impairment of access has been established as a matter of law in inverse condemnation cases").

[23]*Id.* at 841, 711 P.2d at 866.

[24]*Id.* at 839, 711 P.2d at 865.

[25]*Id.* at 840, 711 P.2d at 865.

[26]*Id.* at 840, 711 P.2d at 866.

[27]*Id.* at 841, 711 P.2d at 866.

[28]*Id.*

[29]114 Nev. 137, 952 P.2d 1390 (1998).

[30]*Id.* at 138, 952 P.2d at 1390-91.

landowners' takings claim vested at that time.[31] In analyzing the case, we stated that "[w]hen the government interferes with a person's possession of his/her property, the owner loses an interest in that property."[32]

Although appellants correctly contend that the City's hindrance of a landowner's right to access his or her land could rise to the level of a taking, the duration of any such impairment plays a significant role in determining whether the impairment substantially interferes with the owner's right to access his or her property. With respect to this case, *Culley* and *Argier* are not controlling because they both involved a permanent impairment of property rights. Conversely, in this case, the City did not permanently impair appellants' ability to access their property. Instead, the City erected the temporary barriers for only 48 hours. The short nature of the impairment in this case, as opposed to the permanent impairment in *Culley* and *Argier*, weighs against the existence of a substantial interference.[33]

▬▬■

Authority from Utah is more on point and persuades us that a brief interference with property rights is not a compensable taking. In *Rocky Mountain Thrift v. Salt Lake City*, the Utah Supreme Court held that a substantial interference did not exist when the government barred vehicles from entering a street abutting several businesses for two weeks after a flood.[34] In reaching its holding, the Utah court focused on the fact that the business owners alleged a taking based on a "temporary, one-time occurrence" rather than a "permanent, continuous, or inevitably recurring interference with property rights [that is] usually associated with and requisite in a compensable taking."[35] Although the government in *Rocky*

---

[31]*Id.* at 141-42, 952 P.2d at 1392-93.

[32]*Id.* at 140, 952 P.2d at 1392.

[33]Two California cases also support the notion that a substantial interference with property rights may result when the government permanently impinges upon owners' rights to use, possess, enjoy, access, or defend their properties, but again, these cases do not support a determination that a 48-hour interference constitutes a substantial interference. *See Blumenstein v. City of Long Beach*, 299 P.2d 347, 350-51 (Cal. Dist. Ct. App. 1956) (interpreting *People v. Ricciardi*, 144 P.2d 799, 804 (Cal. 1943) and determining that a substantial interference existed when the government constructed a new highway underpass, so that an owner's business, which was previously situated contiguously with the highway, was no longer directly accessible); *Bacich v. Board of Control of California*, 144 P.2d 818, 824 (Cal. 1943) (determining that a substantial interference with property rights existed when an owner's access to a footpath and a street car line were destroyed, and his residence placed into a cul-de-sac, after the government lowered a formerly adjacent city street 50 feet in order to construct a bridge).

[34]784 P.2d 459, 459-60, 465 (Utah 1989).

[35]*Id.*

*Mountain Thrift* did allow foot traffic during the two-week period, the duration of its prohibition on vehicular traffic was much longer than the City's 48-hour prohibition on all access in this case. Thus, *Rocky Mountain Thrift* weighs against concluding that a substantial impairment occurred in this case.

Here, because the City only temporarily interfered with appellants' property rights and its prohibition on access was limited to a 48-hour emergency period, we conclude that a substantial interference did not occur. Moreover, the City did not appropriate appellants' property and did not physically occupy their property during the flood. Appellants' takings claim thus necessarily fails. Accordingly, we affirm the district court's order granting summary judgment to the City on the takings claim.[36]

### NRS 414.110 governmental immunity

Appellants argue that the City is not immune for acts of negligence, gross negligence, and willful misconduct that occurred before and during the flood emergency. In asserting this argument, appellants invite us to revisit our holdings in *Nylund v. Carson City*[37] and *Vermef v. City of Boulder City*.[38] Having reexamined *Nylund* and *Vermef*, as well as NRS 414.110 in the context of this case, we now retreat from our prior holdings and clarify NRS 414.110's scope.

---

[36]Although not necessary to our disposition regarding appellants' takings claim, we note, in passing, appellants' assertions regarding the Nevada Constitution's "great public peril" clause and the state's police powers. Under Article 1, Section 8 of the Nevada Constitution, "[p]rivate property shall not be taken for public use without just compensation having been first made, or secured, except in cases of war, riot, fire, or great public peril, in which case compensation shall be afterward made." Although we agree with appellants that this constitutional clause was intended to ensure that citizens are compensated for all government takings, including those necessitated by emergency situations, *see* Andrew J. Marsh, Samuel L. Clemens & Amos Bowman, *Reports of the 1863 Constitutional Convention of the Territory of Nevada* 42 (William C. Miller et al. eds., 1972), the clause does not apply in this case because no taking occurred.

We also observe that NRS Chapter 414 delegates police powers to the Governor and local governments during an emergency and that a flood is a justifiable emergency during which the City may impose these powers. In this case, the police officers reasonably exercised these powers when they barred appellants' entry into their businesses shortly before and during the flood, in order to protect appellants' safety. Accordingly, although appellants' assertion that any emergency police powers exception would not impact a takings claim is moot, we note that appellants have failed to establish that the City unjustifiably imposed, or unreasonably exercised, its NRS Chapter 414 police powers in this case.

[37]117 Nev. 913, 34 P.3d 578 (2001).

[38]119 Nev. 549, 80 P.3d 445 (2003).

### Review of and retreat from Nylund and Vermef

*Nylund* involved the same 1997 flood at issue in this case, during which Carson City channeled flood waters down a particular street.[39] After the channeled waters overflowed storm drains and flooded a condominium, the condominium owners sued Carson City for negligently designing and maintaining its storm drainage system and for negligently deciding to channel the flood waters.[40] In response, Carson City moved for summary judgment and argued that it was immune from liability for all of its emergency management actions under NRS 414.110 and for its pre-flood activities under NRS 41.032 and NRS 41.033.[41] The district court then granted Carson City's motion for summary judgment.[42]

On appeal, this court determined that although NRS 414.110 clearly covered governmental action in responding to an emergency, the statute was ambiguous as to whether the government's pre-emergency negligence was immunized.[43] After inferring the Legislature's intent from other sections in Chapter 414, this court read NRS 414.110 as covering "not only negligent emergency management, but also any previous negligence that contributed to the damage caused by the emergency management activities."[44] This court explained that extending NRS 414.110 to include pre-emergency negligence was "a natural extension of the policy underlying NRS 414.110[,] [b]ecause emergencies are sudden and unexpected, [and] the response authority does not have time to assess whether unknown or unforeseen obstacles created by past negligence will hinder its course of action."[45] Based upon this analysis, this court affirmed the district court's order granting summary judgment to Carson City, solely based on NRS 414.110.[46]

*Vermef* also involved floodwaters that damaged a residence.[47] In that case, the homeowner sued Boulder City for negligently constructing a drainage channel adjacent to his property. Boulder City then filed a motion for summary judgment, claiming that it was immune from liability for pre-emergency negligence under NRS 414.110 as interpreted by this court in *Nylund*. The district court

[39]117 Nev. at 914, 34 P.3d at 579.

[40]*Id.*

[41]*Id.* at 915, 34 P.3d at 580.

[42]*Id.*

[43]*Id.* at 916, 34 P.3d at 581.

[44]*Id.*

[45]*Id.* at 917, 34 P.3d at 581.

[46]*Id.*

[47]119 Nev. 549, 552, 80 P.3d 445, 447 (2003).

granted Boulder City's motion for summary judgment based upon NRS 414.110 and *Nylund*.

In reversing the district court's summary judgment and concluding that Boulder City was not immune from liability for Vermef's negligence claim, this court clarified *Nylund* and explained that "a government entity is afforded immunity for pre-emergency negligence when the damage caused by the negligent emergency management was exacerbated by the pre-emergency negligence"[48] but that no immunity attaches for pre-emergency negligence "that is not intertwined with damage caused by later negligent emergency management activities."[49]

Both *Nylund* and *Vermef* suffer from a fundamental flaw in that they frame the issue of the government's immunity for pre-emergency activities as whether pre-emergency negligence contributed to damage caused by later emergency management activities. In doing so, these opinions deviate from NRS 414.110(1)'s plain language, which immunizes the government and its workers from liability relating to "emergency management activities":

> All functions under this chapter and all other activities related to emergency management are hereby declared to be governmental functions. Neither the State nor any political subdivision thereof nor other agencies of the State or political subdivision thereof, nor except in cases of willful misconduct, gross negligence, or bad faith, any worker complying with or reasonably attempting to comply with this chapter, or any order or regulation adopted pursuant to the provisions of this chapter, or pursuant to any ordinance relating to any necessary emergency procedures or other precautionary measures enacted by any political subdivision of the State, is liable for the death of or injury to persons, or for damage to property, as a result of any such activity.

"Emergency management" is defined in NRS 414.035 as preparing for and handling emergencies:

> "Emergency management" means the preparation for and the carrying out of all emergency functions, other than functions for which military forces are primarily responsible, to minimize injury and repair damage resulting from emergencies or disasters caused by enemy attack, sabotage or other hostile action, by fire, flood, earthquake, storm or other natural causes, or by technological or man-made catastrophes, including, without limitation, a crises involving violence on school property, at a school activity or on a school bus. These functions include, without limitation:

---

[48]*Id.*

[49]*Id.* at 553, 80 P.3d at 447.

1. The provision of support for search and rescue operations for persons and property in distress.

2. Organized analysis, planning and coordination of available resources for the mitigation of, preparation for, response to or recovery from emergencies or disasters.

Thus, NRS 414.110(1) immunizes the government from liability for its activities that are related to preparing for and handling emergencies.[50] The statute also immunizes government workers who comply or attempt to comply with emergency procedures, but their immunity is limited to negligent acts: a worker's acts of willful misconduct, gross negligence, or bad faith are not immunized under NRS 414.110(1).

Although we recognize the important role that stare decisis plays in our jurisprudence and reiterate that "[l]egal precedents of this Court should be respected until they are shown to be unsound in principle,"[51] our review of *Nylund* and *Vermef* reveal that their interpretation of NRS 414.110 is faulty. Statutes should be given their plain meaning whenever possible;[52] otherwise, as we have explained, the constitutional separation-of-powers doctrine is implicated.[53] Our reading of NRS 414.110(1) reveals no ambiguity: the statute simply immunizes government from liability for personal injury, death, or property damage that results from its emergency preparation and response activities.

*Nylund* improperly determined that NRS 414.110(1) is ambiguous on the basis that it "does not specifically address . . . whether a government entity can claim immunity . . . for its pre-emergency negligence that contributed to damage caused by later emergency management activities."[54] NRS 414.110(1) does not address pre-emergency negligence that contributes to damages that

---

[50]*See Nylund*, 117 Nev. at 919, 34 P.3d at 582 (concluding that local governments as well as the state are entitled to NRS 414.110 immunity).

[51]*Grotts v. Zahner*, 115 Nev. 339, 342, 989 P.2d 415, 417 (1999) (ROSE, C. J., dissenting) (citing *Thomas v. Washington Gas Light Co.*, 448 U.S. 261, 272 (1980) (plurality opinion) (recognizing that stare decisis not only plays an important role in orderly adjudication, it also serves the broader societal interests in evenhanded, consistent, and predictable application of legal rules) and *Maki v. Frelk*, 239 N.E.2d 445, 447 (Ill. 1968) (stating that "when a rule of law has once been settled, contravening no statute or constitutional principle, such rule ought to be followed unless it can be shown that serious detriment is thereby likely to arise prejudicial to public interests")).

[52]*See, e.g.*, *Edgington v. Edgington*, 119 Nev. 577, 582, 80 P.3d 1282, 1286-87 (2003).

[53]*Pope v. Motel 6*, 121 Nev. 307, 314, 114 P.3d 277, 282 (2005) (noting that to ignore the plain meaning of a statute "would be an impermissible judicial excursion into the legislature's domain").

[54]117 Nev. at 916, 34 P.3d at 581.

ultimately resulted from emergency management activities because it is not intended to cover such negligence, unless this negligence occurred when the city was preparing for the emergency.

By reading such coverage into the statute, *Nylund* impermissibly broadened the immunity provided by the Legislature, as even government activities that are not included in "preparing for" emergency functions would be immune, if they "contributed to" the ultimate damages. Additionally, by including a "contributed to" requirement for immunity, *Nylund* unduly limited the scope of NRS 414.110(1), as all of a government's emergency preparation activities fall within the statute's ambit. Further, both *Nylund*'s "contributed to" and *Vermef*'s "intertwined" language introduce the concept of proximate cause, an element of negligence that plays a role only if immunity does not apply and the action proceeds.[55]

Consequently, we necessarily overrule, in part, our holdings in *Nylund* and *Vermef* and clarify that NRS 414.110(1) creates governmental immunity for emergency preparation activities as well as emergency responses. Whether a pre-emergency act is immune turns solely on whether it was undertaken by the government in preparing for an emergency. Any pre-emergency acts that are not related to such preparation are not immunized under the statute.

### Application of NRS 414.110 immunity in the present case

In this case, the district court determined that the City was immune from liability under NRS 414.110(1) and granted the City summary judgment on that basis. According to appellants, the City was negligent and engaged in gross negligence or willful misconduct in three ways before the flood emergency occurred: (1) by granting Sierra Chemical a use permit to store its hazardous materials in a known flood plain, (2) by requiring the placement of the sunken storm drain, and (3) by lowering the elevation of the bridge adjacent to the levee. Additionally, appellants argue that during its management of the flood emergency, the City was negligent and engaged in gross negligence or willful misconduct in three ways: (1) by not allowing ASAP Storage to follow its evacuation plan, (2) by evacuating appellants from their properties without adequate notice, and (3) by barricading appellants from their properties. According to appellants, the City is also liable for their damages on a respondeat superior theory, based on the conduct of various Doe defendants, described as individuals and the City's political subdivisions or other entities. Appellants maintain that sum-

---

[55]*See, e.g.*, *Sims v. General Telephone & Electric*, 107 Nev. 516, 521, 815 P.2d 151, 154 (1991) (noting that legal, or proximate, causation is a required element of any negligence claim).

mary judgment on NRS 414.110(1) grounds was not appropriate because the City acted with gross negligence or willful misconduct, for which NRS 414.110(1) does not provide immunity.

Regarding the City's alleged pre-emergency negligence, gross negligence, or willful misconduct, the City's NRS 414.110(1) immunity generally turns on whether its activities were undertaken in preparing for an emergency. Since the parties argued and the district court considered the pre-emergency issues in light of our *Nylund* and *Vermef* holdings, we necessarily reverse the district court's summary judgment with respect to these claims and remand for further proceedings in light of this opinion clarifying NRS 414.110(1)'s scope and application.

Although, on its face, NRS 414.110(1) provides the City with absolute immunity for its emergency planning activities and emergency functions related to the flood, it provides less immunity to workers who comply or attempt to comply with NRS Chapter 414 or emergency procedures or measures. Workers' immunity is limited to negligent acts; acts of gross negligence, willful misconduct, or bad faith are not immunized. This statutory disparity creates a latent ambiguity when considered in the context of vicarious liability, which appellants have raised.[56] Since a municipality like the City is generally deemed vicariously liable for its employees' acts that occur within the course and scope of employment,[57] and workers do not have immunity under NRS 414.110 for gross negligence, willful misconduct, or bad faith, the City is potentially vicariously liable for such non-immunized acts by its workers. As any vicarious liability would defeat NRS 414.110's broad grant of immunity to government entities, and NRS 414.110 facially creates absolute immunity for government entities engaged in emergency management activities, the statute may indicate that these entities are not vicariously liable for their workers' gross negligence, willful misconduct, or bad faith.[58]

---

[56]*See, e.g.*, *Rubin v. State Farm Mut. Auto. Ins. Co.*, 118 Nev. 299, 303, 43 P.3d 1018, 1021 (2002) (explaining that a latent ambiguity exists when otherwise clear language, when applied to the facts at issue, renders uncertain results).

[57]*See* NRS 41.745 (providing that public and private employers are not liable for harm caused by their employees' intentional conduct if that conduct was (1) "a truly independent venture of the employee," (2) "not committed in the course of the very task assigned to the employee," and (3) "not reasonably foreseeable under the facts and circumstances of the case considering the nature and scope of his employment"); *Wood v. Safeway, Inc.*, 121 Nev. 724, 738-39, 121 P.3d 1026, 1035 (2005); *Hughey v. Washoe County*, 73 Nev. 22, 23, 306 P.2d 1115, 1115 (1957) (applying the respondeat superior doctrine to a government entity).

[58]*See, e.g.*, *Margan v. Niles*, 250 F. Supp. 2d 63, 75 n.13 (N.D.N.Y. 2003) (noting that an inconsistency would exist if vicarious liability were imposed on a government employer that is exempted from civil liability).

Although the latent ambiguity in NRS 414.110 raised by the potential application of vicarious liability is significant, we need not resolve the ambiguity at this time.[59] In its answer, the City relied on both NRS 414.110 and NRS 41.032(2), which grants government entities and their employees immunity for discretionary functions and duties. The district court, in granting summary judgment, considered the City's immunity only under NRS 414.110. If the City and the employees acting on its behalf are ultimately immune from suit under NRS 41.032(2), then no issues of vicarious liability will remain. Thus, on remand, the district court must resolve the issue of the City's NRS 41.032(2) immunity from suit for any alleged gross negligence or willful misconduct by its employees, for which the City could otherwise be vicariously liable.[60] If NRS 41.032(2) immunity does not attach, then the district court should consider, in the first instance, whether NRS 414.110(1) immunity defeats the City's potential vicarious liability.

With respect to the City's alleged negligence, gross negligence, or willful misconduct in handling the emergency, NRS 414.110(1) immunizes the City from liability for, among other things, property damage. As with pre-emergency activities, however, the City's workers enjoy only limited immunity under the statute. Thus, on remand, the district court must examine, in the context of the City's handling of the flood emergency, its NRS 41.032(2) immunity from suit for any alleged gross negligence, willful misconduct, or bad faith by its employees, for which the City could otherwise be vicariously liable.

### ASAP Storage's contract claim

Finally, ASAP Storage argues that it presented sufficient evidence to assert a genuine issue of material fact regarding its claim for breach of contract. We note that the district court's order granting summary judgment did not, as required, ''set forth the undisputed material facts and legal determinations'' regarding this claim.[61] Therefore, we reverse that portion of the district court's

---

[59]Nor do we address, at this time, the interplay between NRS 41.0349 and the government immunity provisions of NRS 414.110. NRS 41.0349 provides that a government employee may generally seek indemnification from his or her employer when a judgment is entered against the employee ''based on any act or omission relating to his public duty or employment.'' In this case, as no individual employees were named in appellants' complaint, no indemnification issues exist.

[60]See Martinez v. Maruszczak, 123 Nev. 433, 168 P.3d 720 (2007).

[61]NRCP 56(c).

order granting summary judgment on this claim and remand to the district court for further proceedings.

## CONCLUSION

The Nevada Constitution requires the government to pay just compensation to owners of personal property if the government takes it for public use. A taking did not occur in this case, however, because of the short-term nature of the City's actions, which occurred over a 48-hour period. Thus, we affirm the district court's order to the extent that it granted summary judgment on appellants' takings claim. As to appellants' tort claims, we overrule, in part, our prior holdings in *Nylund* and *Vermef* and conclude that NRS 414.110 grants immunity for acts related to preparing for emergencies. As the parties litigated and the district court considered the pre-emergency acts under our former standards, we necessarily reverse the district court's order granting summary judgment to the City on appellants' pre-emergency claims. On remand, the district court must also consider whether the City is immune from suit under NRS 41.032(2) for any alleged pre-emergency gross negligence or willful misconduct by its employees, for which the City could be vicariously liable under NRS 414.110(1). With respect to the district court's order granting summary judgment on the claims related to the City's handling of the flood emergency, on remand, the district court must also consider whether the City is immune from suit under NRS 41.032(2) for any alleged gross negligence, willful misconduct, or bad faith by its employees in responding to the emergency. Finally, we reverse the district court's order granting summary judgment to the City on ASAP Storage's breach-of-contract claim. If, on remand, the district court is inclined to grant summary judgment on this claim, then it shall comply with the requirements of NRCP 56(c).

HARDESTY, PARRAGUIRRE, DOUGLAS, CHERRY and SAITTA, JJ., concur.

MAUPIN, C. J., concurring:

I concur in the majority opinion, but would resolve the latent ambiguity identified with regard to NRS 414.110(1). In my view, NRS 414.110(1) does not bar appellants' claims of gross negligence against the City of Sparks.

The State of Nevada has qualifiedly waived its sovereign immunity and that of its political subdivisions, including the City, in NRS Chapter 41. NRS 414.110(1) re-creates governmental immunity in connection with acts of negligence in the performance of emergency management. But, as we have said in other contexts, re-

strictions on the waiver of sovereign immunity under NRS Chapter 41 must be narrowly construed.[1]

With regard to emergency planning and measures taken in the form of an emergency response, NRS 414.110(1) provides that:

> All functions under this chapter and all other activities relating to emergency management are hereby declared to be governmental functions. Neither the State nor any political subdivision thereof nor other agencies of the State or political subdivision thereof, nor except in cases of willful misconduct, gross negligence, or bad faith, any worker complying with or reasonably attempting to comply with this chapter, or any order or regulation adopted pursuant to the provisions of this chapter, or pursuant to any ordinance relating to any necessary emergency procedures or other precautionary measures enacted by any political subdivision of the State, is liable for the death of or injury to persons, or for damage to property, as a result of any such activity.

The majority notes that NRS 414.110(1) may arguably create absolute immunity for the government itself, while retaining the exposure of government operatives/employees to liability in the undertaking of emergency management in the event of gross negligence, intentional misconduct, or bad faith. While this reading seems plausible, it runs counter to the fundamental precept that government, like corporate entities, has no ability to act except through its agents/employees. It makes no sense to me that a government entity, which can only be liable in tort based upon the acts of its agents, would be immune vicariously for the acts of its agents while the agents themselves are qualifiedly exposed.[2]

As stated, any limitations on Nevada's waiver of sovereign immunity must be strictly construed. In my view, when read in the context of the government's fundamental exposure to liability pursuant to the qualified waiver of sovereign immunity, *i.e.*, through vicarious or imputed responsibility for acts of its agents, NRS 414.110(1) does not clearly or unambiguously restrict the general waiver of sovereign immunity of the state and its political subdivisions when it reserves liability to the only medium through which imputed liability may attach, its agents.

To explain, NRS 414.110(1) starts with the notion that all emergency management is a function of government and then stipulates that the government is immune in connection with such activity. Having done so, the measure anomalously reserves limited liability (for gross negligence, bad faith, and intentional misconduct) in connection with what the government actually is in its executive ca-

---

[1]*See State v. Silva*, 86 Nev. 911, 914, 478 P.2d 591, 593 (1970).

[2]Subject to capped liability under NRS 41.035.

pacity, its operatives. Thus, as noted by the majority, an inherent ambiguity arises.

One might justify this immunity dichotomy on the basis that acts of bad faith and intentional misconduct in connection with emergency management might not, as a general matter, implicate vicarious imposition of liability upon a government principal. However, occasions can arise, as in the case of corporate entities, under which vicarious liability would lie; *i.e.*, based upon such notions as prior authorization, ratification, or actions by a principal government actor.[3] And, certainly, acts of gross negligence committed within the course and scope of employment would, as a matter of law, be vicariously imputed to the principal, here the government entity.

In short, NRS 414.110(1) does not clearly immunize state and local governments from the excepted acts—gross negligence, bad faith, and intentional misconduct—because reservation of such liability to government actors, as a real matter, reserves liability against the government itself.

My views on this subject are underscored by NRS 41.0349, which provides that government employees, including employees of political subdivisions such as this respondent, must be indemnified by their government masters for wrongs committed in the course of their public employment:

> **Indemnification of present or former public officer, employee, immune contractor or Legislator.** In any civil action brought against any present or former officer, employee, immune contractor, member of a board or commission of the State or a political subdivision or State Legislator, in which a judgment is entered against the defendant based on any act or omission relating to his public duty or employment, the State or political subdivision shall indemnify him unless:
>
> 1. The person failed to submit a timely request for defense;
>
> 2. The person failed to cooperate in good faith in the defense of the action;
>
> 3. The act or omission of the person was not within the scope of his public duty or employment; or
>
> 4. The act or omission of the person was wanton or malicious.

A reading of NRS 414.110(1) with NRS 41.0349 seriously undermines the conclusion that the City, but not its employees, is im-

---

[3]*See Smith's Food & Drug Cntrs. v. Bellegarde*, 114 Nev. 602, 610-11, 958 P.2d 1208, 1214 (1998) (establishing the parameters of vicarious corporate liability); *see also Nittinger v. Holman*, 119 Nev. 192, 195-96, 69 P.3d 688, 690-91 (2003); *Evans v. Dean Witter Reynolds, Inc.*, 598 Nev. 613-14, 5 P.3d 1043, 1052-53 (2000).

mune from acts of gross negligence.[4] Along with the fact that such negligence would ordinarily be vicariously imputed to the City, NRS 41.0349 absolutely requires that the City indemnify any employee for that negligence. It is incongruous to hold that the City is immune from acts of gross negligence of its employees,[5] but that such immunity is neutralized by the simple procedural act of naming the employees in the suit and forcing them to seek indemnity under NRS 41.0349.

Accordingly, I would conclude that NRS 414.110(1) does not preclude appellants' claim of gross negligence against the City on a various liability theory and would allow these appellants to proceed with their gross negligence claims against the City.

---

[4] I note that the second amended complaint alleges gross negligence as to the City itself, not as to any particular employees.

[5] The terms of the second amended complaint do not allege acts of bad faith or intentional tortious misconduct.